**CONSOVOY MCCARTHY PLLC**
J. Michael Connolly (PHV forthcoming)
Paul R. Draper (Cal. Bar No. 345071)
    (C.D. Cal. bar application pending)
paul@consovoymccarthy.com
Marie E. Sayer (PHV forthcoming)
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423

**ALTVIEW LAW GROUP LLP**
John M. Begakis (Cal. Bar No. 278681)
9454 Wilshire Blvd., Suite 825
Beverly Hills, CA 90212
(310) 230-5580
john@altviewlawgroup.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| DEFENDING EDUCATION,<br><br>*Plaintiff,*<br><br>v.<br><br>MARIA ANGUIANO, RUSTY AREIAS, ELAINE BATCHLOR, SONYA BROOKS, CARMEN CHU, MICHAEL COHEN, JOSE M. HERNANDEZ, MABELLE HUESTON, BRIAN KOMOTO, NANCY LEE, HADI MAKARECHIAN, ANA MATOSANTOS, ROBERT MYERS, LARK PARK, JANET REILLY, CHIP ROBERTSON, MARK ROBINSON, GREGORY SARRIS, JONATHAN SURES, ANN WANG, GAVIN NEWSOM, ELENI KOUNALAKIS, ROBERT RIVAS, AND TONY | Case No. _____<br><br>**VERIFIED COMPLAINT**<br><br>**ACTION SEEKING STATEWIDE RELIEF** |

1

THURMOND, each in their official capacities as Regents; JAMES B. MILLIKEN, in his official capacity as President of the UC System and Regent; RACHAEL NAVA, in her official capacity as Executive Vice President and Chief Operating Officer of the UC System; DIANNA HENDERSON, in her official capacity as Vice President of Systemwide Human Resources and Chief Human Resources Officer; CATHERINE CRISWELL SPEAR, in her official capacity as the Executive Director of the Systemwide Office of Civil Rights; NICOLI RICHARDSON, in her official capacity as the Systemwide Title IX Director; JULIO FRENK, in his official capacity as the Chancellor of UCLA; MARK KRAUSE, in his official capacity as UCLA's Vice Chancellor and Chief Compliance and Audit Officer; MOHAMMED CATO, in his official capacity as UCLA's Director of the Title IX Office; HOWARD GILLMAN, in his official capacity as the Chancellor of UCI; KIRSTEN K. QUANBECK, in her official capacity as UCI's Vice Chancellor for Equal Opportunity and Compliance; GWENDOLYN KUHNS BLACK, in her official capacity as UCI's Assistant Vice Chancellor for Equal Opportunity and Diversity; TIERNEY ANDERSON in her official capacity as UCI's Assistant Vice Chancellor for Equal Opportunity; PRADEEP K. KHOSLA, in his official capacity as the Chancellor of UCSD; SHENETHIA MANUEL, in her official capacity as UCSD's Chief Ethics and Compliance Officer; MICHAEL DIAZ, in his official capacity as UCSD's Director for the

Office of Prevention of Harassment and
Discrimination,

*Defendants.*

Plaintiff Defending Education brings this action under the First and Fourteenth Amendments to the United States Constitution, *see* 42 U.S.C. §1983, against Defendants and alleges as follows:

**INTRODUCTION**

1. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia v. Barnette*, 319 U.S. 624, 642 (1943). Governments cannot ban speech merely because some find it "offensive." *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). And they certainly cannot coerce speech on "matters of profound value and concern to the public" like "sexual orientation and gender identity." *Janus v. AFSCME*, 585 U.S. 878, 913-14 (2018) (cleaned up). This is especially true for colleges and universities, where students' First Amendment rights are at their strongest. *See Healy v. James*, 408 U.S. 169, 180 (1972).

2. The University of California (UC) is flouting these fundamental principles. Under the guise of combatting "sexual harassment," UC has enacted a speech

3

code that punishes students for engaging in protected speech and discourages them from expressing views outside of the university-approved mainstream.

3.      UC's "Sexual Violence and Sexual Harassment" Policy contains a hostile-environment harassment provision that disciplines students who engage in "unwelcome … sex-based conduct" that is "offensive" and "sufficiently severe, persistent *or* pervasive that" it "limits" or "interferes with a person's" educational experience. The Hostile-Environment Provision extends beyond the Supreme Court's standard for actionable harassment in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), which was crafted precisely to avoid clashing with the First Amendment.

4.      Indeed, according to UC, its Policy prohibits speech in addition to physical conduct: "[S]ex-based conduct includes acts of verbal … intimidatio[n] or hostility based on gender, gender identity, gender expression, sex- or gender-stereotyping, or sexual orientation." And it covers "derogatory names or slurs," "offensive terms," and "jokes." For example, students who voice dissenting opinions on transgender issues, like the belief that someone should "use a particular bathroom that does not correspond to their gender identity," can be punished under the Hostile-Environment Provision.

5.      Worse, the SVSH Policy goes on to state, in FAQ #14, that it prohibits the "intentional or repeated use of a name or pronoun inconsistent with [an] individual's gender identity (i.e., misgendering)." FAQ #14 also prohibits students from

4

"intentionally and repeatedly call[ing]" someone by a "dead name (i.e., refer[ring] to a name that a transgender person was given at birth but that they no longer use)."

6.    Defending Education has members who attend UC System schools and whose protected speech is chilled by the SVSH Policy. The Hostile-Environment Provision and FAQ #14 should be declared unconstitutional and Defendants should be enjoined from enforcing them.

## JURISDICTION AND VENUE

7.    This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought via 42 U.S.C. §§1983 and 1988.

8.    This Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343.

9.    Venue is proper in this District and division under 28 U.S.C. §1391 because some of the Defendants reside in this District and division and all Defendants reside in the State of California, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

10.    Plaintiff Defending Education is a nationwide, grassroots, 501(c)(3) non-profit membership organization whose members include students, parents, and others who are concerned about the state of education in America. DE's mission is to prevent—through advocacy, disclosure, and, if necessary, litigation—the politicization of

5

education. Defending Education is dedicated to preserving civil rights secured by law, including the freedom of expression guaranteed by the First Amendment. *Defending Education Newsroom – Litigation*, DE (archived June 10, 2026), perma.cc/ZE5N-JBVA (cataloguing DE's litigation efforts); *see, e.g.*, *Defending Education v. Olentangy Local Sch. Dist. Bd. of Educ.*, 158 F.4th 732 (6th Cir. 2025) (en banc).

11.     Defending Education's members include students who attend UC System schools, including Students A, B, C, and D.

12.     The University of California is a public university system in the State of California. The UC System is one university governed by the Regents of the University of California, composed of ten campuses across the State, including the University of California, Los Angeles; University of California, Irvine; and University of California, San Diego. The UC System creates policies and standards that govern all ten campuses.

13.     Defendants Maria Anguiano, Rusty Areias, Elaine Batchlor, Sonya Brooks, Carmen Chu, Michael Cohen, Jose M. Hernandez, Mabelle Hueston, Brian Komoto, Nancy Lee, Hadi Makarechian, Ana Matosantos, Robert Myers, Lark Park, Janet Reilly, Chip Robertson, Mark Robinson, Gregory Sarris, Jonathan Sures, and Ann Wang are appointed regents of the UC System and are sued in their official capacities.

14.     Defendants Gavin Newsom, Eleni Kounalakis, Robert Rivas, and Tony Thurmond are ex officio regents of the UC System and are sued in their official capacities.

15. Defendant James B. Milliken is the president of the University of California and an ex officio regent of the UC System. Milliken has full authority and responsibility over the administration of all affairs and operations of the UC System. Milliken has been the UC President since 2025. Milliken is sued in an official capacity.

16. Defendant Rachael Nava is the Executive Vice President and Chief Operating Officer of the UC System. Nava oversees the Operations division, including systemwide human resources and community safety. Nava is sued in an official capacity.

17. Defendant Dianna Henderson is the Vice President of Systemwide Human Resources and Chief Human Resources Officer. Henderson is responsible for systemwide human resources and programs. Henderson is sued in an official capacity.

18. Defendant Catherine Criswell Spear is the Executive Director of the Systemwide Office of Civil Rights, which is composed of the systemwide Title IX, Anti-Discrimination, and Disability Rights offices. The Office provides systemwide guidance in these areas and "ensure[s] uniform interpretation and consistent implementation of the" SVSH Policy. It also provides "leadership, training, education, and investigative support" to local campuses in these areas. Civil rights officers at each campus "have a dual reporting line" to Spear. Spear is sued in an official capacity.

19. Defendant Nicoli Richardson is the Systemwide Title IX Director. The systemwide Title IX office provides direction to the campus Title IX offices, "assist[s] in implementing systemwide initiatives and best practices in harassment prevention

and response," and provides "investigative support" to campus offices. Richardson is responsible for ensuring UC's compliance with the SVSH Policy. Richardson is sued in an official capacity.

20. Defendant Julio Frenk is the Chancellor of UCLA. Frenk is responsible for administration and operation of the UCLA campus and oversees all UCLA faculty personnel and staff. Frenk is sued in an official capacity.

21. Defendant Mark Krause is UCLA's Associate Vice Chancellor and Chief Compliance and Audit Officer. Krause is responsible for ensuring UCLA management maintains compliance with applicable laws, regulations, and policies, including the SVSH Policy. Krause is sued in an official capacity.

22. Defendant Mohammed Cato is UCLA's Director of the Title IX Office, which is responsible for carrying out UC's SVSH Policy. Cato is responsible for accepting and handling reports of violations of the SVSH Policy. Cato is sued in an official capacity.

23. Defendant Howard Gillman is the Chancellor of UCI. Gillman is responsible for administration and operation of the UCI campus and oversees all UCI faculty personnel and staff. Gillman is sued in an official capacity.

24. Defendant Kirsten K. Quanbeck is UCI's Vice Chancellor for Equal Opportunity and Compliance. Quanbeck serves as UCI's chief ethics and compliance officer, responsible for ensuring UCI's compliance with the SVSH Policy. Quanbeck also

8

oversees the Office of Equal Opportunity and Diversity. Quanbeck is sued in an official capacity.

25. Defendant Gwendolyn Kuhns Black is UCI's Assistant Vice Chancellor for Equal Opportunity and Diversity, which is responsible for UCI's compliance with UC's SVSH Policy. Black is sued in an official capacity.

26. Defendant Tierney Anderson is UCI's Assistance Vice Chancellor for Equal Opportunity. Anderson is also UCI's Title IX officer. Anderson is responsible for accepting and handling reports of violations of the SVSH Policy. Anderson is sued in an official capacity.

27. Defendant Pradeep K. Khosla is the Chancellor of UCSD. Khosla is responsible for administration and operation of the UCSD campus and oversees all UCSD faculty personnel and staff. Khosla is sued in an official capacity.

28. Defendant Shenethia Manuel is UCSD's Chief Ethics and Compliance Officer. Manuel is responsible for evaluating UCSD's compliance with all laws, rules, and regulations, including the SVSH Policy. Manuel is sued in an official capacity.

29. Defendant Michael Diaz is UCSD's Director of the Office for the Prevention of Harassment and Discrimination, which is responsible for assessing and investigating reports of discrimination. Diaz is also UCSD's Title IX Officer and the local implementation officer for UC's Anti-Discrimination Policy, meaning Diaz is responsible for accepting and handling reports of violations of the SVSH Policy. Diaz is sued in an official capacity.

## BACKGROUND

### I.    College Students and Their First Amendment Rights

30.    "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

31.    The First Amendment's importance is at its apex at our nation's colleges and universities. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher education]. The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). The core principles of the First Amendment "acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission." *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957).

32.     The First Amendment's protections, moreover, are "not confined to the supervised and ordained discussion which takes place in the classroom" but extend throughout a university's campus. *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (E.D. Ohio 1979).

33.     Put simply, "First Amendment protections [do not] apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180. "[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish*, 410 U.S. at 670. Indeed, "the point of all speech protection … is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995). These principles apply with more force "[i]n our current national condition," not less. *Speech First v. Fenves*, 979 F.3d 319, 339 (5th Cir. 2020).

## II.     The Growing Use of Speech Codes to Punish Student Speech Regarding Gender Identity

34.     Instead of promoting the "robust exchange of ideas," *Keyishian*, 385 U.S. at 603, universities now are often more interested in protecting students from ideas that make them uncomfortable. Universities do this by adopting policies and procedures that discourage speech by students who dare to disagree with the prevailing campus orthodoxy.

11

35.     One tried-and-true method of accomplishing this feat is the campus speech code. Speech codes, according to the Foundation for Individual Rights and Expression (FIRE), are "any university regulation or policy that prohibits expression that would be protected by the First Amendment in society at large." *What Are Speech Codes?*, FIRE (archived Jun. 15, 2026), perma.cc/6Z2K-P37A.

36.     Speech codes punish students for undesirable categories of speech such as "harassment," "bullying," "hate speech," and "incivility." But "anti-discrimination" and "anti-harassment" policies cannot be used as a sword to compel students to speak in the way the government dictates, contrary to their deeply held beliefs. That is why courts have a "long-standing hesitation to enforce anti-discrimination statutes in the speech context." *Green v. Miss USA, LLC*, 52 F.4th 773, 792 (9th Cir. 2022); *see also, e.g.*, *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.) ("There is no categorical 'harassment exception' to the First Amendment's free speech clause."). Because speech codes impose vague, overbroad, content-based (and often viewpoint-based) restrictions on speech, they are unconstitutional. *Spotlight on Speech Codes 2020*, FIRE, at 10 & n.11 (2020), perma.cc/G77E-4629; *see Fenves*, 979 F.3d at 338-39 & n.17 (collecting a "consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague").

37.     One common category of disfavored speech that schools and universities are increasingly seeking to punish is speech regarding gender identity. Such policies

12

compel students to affirm beliefs they do not hold and that are incompatible with their deeply held convictions.

38.    One common example is a policy that requires students to use other students' "preferred pronouns," even if those pronouns are contrary to the other students' sex. While sex-specific personal pronouns ("he," "him," and "his," or "she," "her," and "hers") have long been used for males and females respectively, some individuals are now adopting different pronouns, including new sets of "gender-neutral pronouns," that do not correlate with their biological sex. *See Bostock v. Clayton County*, 590 U.S. 644, 731 (2020) (Alito, J., dissenting); *see also, e.g.*, *United States v. Varner*, 948 F.3d 250, 257 (5th Cir. 2020). A "preferred pronoun" policy requires others to adopt a student's chosen pronouns when referring to the student, even if different from his or her biological sex.

39.    "Preferred pronoun policies" subject students to formal discipline for referring to other students according to the pronouns that are consistent with their biological sex rather than their gender identity. Under these types of policies, a student who uses "he" or "him" when referring to a biological male who identifies as a female will be punished for "misgendering" that student. *See, e.g.*, *Olentangy*, 158 F.4th at 738 (enjoining operation of school district's preferred-pronoun policy).

40.    Such policies "li[e] at the crossroads of competing visions of family and faith, for which people of goodwill in our country can have different perspectives." *Bates v. Pakseresht*, 146 F.4th 772, 783 (9th Cir. 2025). "As part of the broader debate

13

over transgender rights, the question whether speakers should use preferred pronouns to refer to transgender individuals—and whether we should treat the commonplace (and non-antagonistic) use of biological pronouns as proper or offensive—has stirred a 'passionate political and social debate' in our society." *Olentangy*, 158 F.4th at 753; *see also Janus*, 585 U.S. at 913-14 (explaining that "sexual orientation and gender identity" are "sensitive political topics [that] are undoubtedly matters of profound value and concern to the public" (cleaned up)). "Never before have titles and pronouns been scrutinized as closely as they are today for their power to validate—or invalidate—someone's perceived sex or gender identity." *Meriwether v. Hartop*, 992 F.3d 492, 509 (6th Cir. 2021).

41.    So it is unsurprising that "titles and pronouns carry a message." *Id.* at 507. When, as here, schools adopt policies barring misgendering, they "recogniz[e] that and wan[t] [their] [school officials and students] to use pronouns to communicate a message: People can have a gender identity inconsistent with their sex at birth." *Id.* Similarly, the "continued refusal to address [a biological male] as a woman" (or vice versa) "advance[s]" the contrary view "that sex is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires." *Id.* at 509 (cleaned up). Simply put, "[p]ronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Id.* at 508; *see also Green*, 52 F.4th at 784 n.12 (explaining that "for controversies regarding transgenderism," "an individual's use or omission of certain words and phrases in this context often reflects

14

a 'struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes'").

42.    The Constitution prohibits the government from putting its thumb on the scale in this debate. But requiring someone to affirm someone else's gender identity does just that. It forces the speaker to take "a side in that debate," even when it is contrary to the person's deeply held convictions. *Meriwether*, 992 F.3d at 509.

43.    Whether a public university is compelling students to use a preferred pronoun, contrary to sex, or prohibiting students from using preferred pronouns, contrary to sex, the university is transgressing the First Amendment. *See Bates*, 146 F.4th at 786 (pronoun policies both "restric[t] and requir[e] speech based on content and viewpoint"); *Meriwether*, 992 F.3d at 506 ("By defendants' logic, a university could likewise prohibit professors from addressing university students by their preferred gender pronouns—no matter the professors' own views. And it could even impose such a restriction while denying professors the ability to explain to students why they were doing so."). The university cannot impose its preferred viewpoint (*e.g.*, persons can transition genders) over another (*e.g.*, sex is immutable). "To hold differently would be to treat religious [or traditionally conservative] expression as second-class speech." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 531 (2022).

44.    The consequences of these unconstitutional speech policies are unsurprising. As such policies have proliferated on American campuses, so too has the number of students who believe they are not free to express controversial opinions on

15

campus. According to a recent survey of almost 70,000 American college students, roughly half of those surveyed report feeling uncomfortable expressing their views on controversial political topics in class or in conversations with other students. *2026 College Free Speech Rankings*, FIRE, at 25 (2026), perma.cc/M9LW-RSRJ. Especially relevant here, 41% of students say it is "difficult" to have an "open and honest conversation" about transgender issues on their campus. *Id.* at 5. And on the other side of the coin, a full 74% of students say that a visiting speaker who believes that "[t]ransgender people have a mental disorder" "definitely" or "probably" shouldn't be allowed to speak. *Id.* at 26. Well over half of surveyed students report self-censoring in conversations with other students and with professors. *Id.* at 26. And this free-speech crisis is politically lopsided. Students who identify as moderate or conservative are less comfortable expressing their views on controversial topics and feel compelled to self-censor more frequently than their liberal peers. *2025 College Free Speech Rankings*, FIRE, at 24, 26 (2025),perma.cc/K86J-MQW.

45. The University of California System is no exception. In a 2026 free speech ranking of American colleges, UCLA, UCSD, and UCI all received an "F" grade for their speech climates. *College Free Speech Rankings*, FIRE (2026) (UCLA: perma.cc/9V7M-7BWQ) (UCSD: perma.cc/C424-Y699) (UCI: perma.cc/4ZAR-CH7A)

46. Those "F" grades are well-earned. Examples of speech suppression abound on UC's campuses. Last year, for example, a student at UCI was subject to

disciplinary proceedings for having a doormat outside her campus apartment that read "No Warrant. No Entry." Graham Piro, *UC Irvine is crusading over student doormats—and wiping its feet on the Constitution*, FIRE (May 15, 2025), perma.cc/HFV5-9H78. The student and several others were charged with violating the school's ban on doormats with "words or images," and those disciplinary charges were only dropped after publicity. *Id.*

47.    Just this past spring, at a speaking event at UCLA hosted by the UCLA Federalist Society chapter, the general counsel of the Department of Homeland Security was disrupted by protestors booing and playing alarm sounds on their phone throughout the entirety of the speech. *See* Andrew Mark Miller, *Watch: Chaos erupts as leftists interrupt conservative group's UCLA event featuring DHS lawyer*, Fox News (Apr. 22, 2026), perma.cc/B5R3-96FF. Administrators did nothing to stop the disruption, and instead claimed the fact that the event "proceeded to its conclusion" was an example of UCLA's free speech "principles in practice." *Id.*

48.    Rather than punish the offenders, shortly after the event, a UCLA administrator threatened the Federalist Society students. Madison Colombo, *UCLA official warns conservative law students they face discipline for identifying liberal protesters*, Fox News (Apr. 28, 2026), perma.cc/ZU6K-ZWGQ. The administrator "encourage[d] … organizers to not disclose" the identities of protestors publicly. She threatened that the Federalist Society chapter and individual students could be "subjected to campus processes" for

17

potential "prohibited behavior per the Student Code of Conduct" if "that information is shared." *Id.*

49.    At another event this spring at UC Berkeley, organizers were forced to shut down their program after protestors interrupted. Madeleine Kashkooli, *Protestors shut down Berkeley Forum event hosting Google AI scientist*, Daily Californian (May 1, 2026) perma.cc/Q2CD-UY44. The Berkeley Forum and College of Engineering sponsored an event with Google Chief scientist and Gemini lead Jeff Dean. *Id.* Protestors took over the stage with a megaphone and refused to let Dean speak. Campus police officers and university officials were in the room, but the organizers had to end the event when the protestors refused to leave or allow Dean to finish his lecture. *Id.*

## III.    UC's Speech Codes

50.    In line with this growing—and unconstitutional—trend, the University of California System has adopted a "Sexual Violence and Sexual Harassment" (SVSH) Policy that unconstitutionally impinges on students' free speech rights. UC issued a revised version of the SVSH Policy on December 22, 2025. The Policy became effective on January 1, 2026. The Policy "applies at all University campuses," including UCLA, UCI, and UCSD. And it applies to everyone connected with the UC System, including all undergraduate, graduate, and professional students.

51.    The revised SVSH Policy violates the Constitution in two ways: One, the SVSH Policy prohibits broad categories of protected speech that do not constitute actionable harassment. Two, the SVSH Policy punishes students who use language that

18

does not affirm another person's gender identity—through the use of preferred pronouns, chosen names and other so-called gender-affirming language—when that identity is inconsistent with the person's biological sex.

### A.    The Hostile-Environment Provision

52.    The SVSH Policy prohibits, among other things, "sexual harassment."

53.    The SVSH Policy contains the Hostile-Environment Provision, which defines "sexual harassment" to include a "hostile environment," which is "unwelcome sexual or other sex-based conduct [that] is sufficiently severe, persistent or pervasive that it unreasonably denies, adversely limits, or interferes with a person's participation in or benefit from the education, employment or other programs or activities of the University, and creates an environment that a reasonable person would find to be intimidating or offensive."

54.    "Other sex-based conduct" is defined to include "acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on gender, gender identity, gender expression, sex- or gender-stereotyping, or sexual orientation."

55.    UC leaves no doubt that its ban on hostile-environment harassment covers protected speech. In addition to clarifying that "verbal" speech generally can violate the Provision, UC offers a non-exhaustive set of "examples" of prohibited language. That list includes the use of "derogatory names or slurs" or other "offensive terms." It also includes "jokes" made about someone's "sexual orientation."

19

**B.    FAQ #14**

56.    In its Frequently Asked Questions section (FAQ #14), the SVSH Policy states that "intentional or repeated use of a name or pronoun inconsistent with the individual's gender identity (i.e., misgendering)" is a type of "harassment" that is "Prohibited Conduct under this Policy."

57.    FAQ #14 further prohibits "intentionally and repeatedly call[ing]" another person by a "dead name," which means "refer[ring] to a name that a transgender person was given at birth but that they no longer use)."

**C.    Enforcement**

58.    The Hostile-Environment Provision and FAQ #14 apply broadly, covering speech that occurs during any UC program or activity, on any campus or other UC property, and even off-campus and unrelated to a UC program or activity so long as there are "continuing adverse effects on" or a "hostile environment" for students. The SVSH Policy prohibits speech whether it occurs in person, over the internet, or via "other devices or forms of contact."

59.    It is easy for a student engaging in prohibited speech to be reported. "Any person can report conduct that may be Prohibited Conduct," regardless of whether they were the object of the prohibited conduct. Complaints can be submitted anonymously.

60.    In addition, most UC employees are required to report suspicions of prohibited conduct, even if they did not personally witness the conduct and even if they

20

are not sure that the conduct actually occurred. "If a Responsible Employee," which includes "[a]ny University employee who is not" acting in a "confidential capacity," "learns … that a student may have experienced prohibited conduct …, they must promptly notify" their campus's enforcing authority. "This includes resident assistants, graduate teaching assistants, and all other student employees."

61.    The SVSH Policy has "no time limit for reporting." For example, if a student "misgenders" another student, that student (or anyone else who learned of it) could wait months or even years after the incident to report it.

62.    Reports can be made to the Title IX officer at each campus, or to any Responsible Employee or "appropriate office," who will forward it to the Title IX officer. UCLA, UCSD, and UCI allow reports to be made online via reporting forms, via email, over the phone, or in person.

63.    UC officials will "respond promptly and equitably to reports of Prohibited Conduct" and will "take prompt and effective steps reasonably calculated to stop the violation, prevent its recurrence, and, as appropriate, remedy its effects."

64.    UC officials can also take action themselves, *without* a report, if they identify a "pattern of alleged sexually harassing conduct toward multiple people by the same Respondent that would, in the aggregate, create a hostile environment" or if they see "allegations of Prohibited Conduct covered by this Policy in the public realm (such as reports in the news or social media)."

65. "Consequences of engaging in Prohibited Conduct" include discipline "up to and including dismissal" from the UC System. Short of that, UC threatens punishments including "revocation" of an awarded academic degree, "[s]uspension," "[e]xclusion" from areas of the campus or UC functions, "[e]xclusion from participation in designated privileges and activities for a specified period of time," "[d]isciplinary probation" that can likewise "restric[t] the student's privileges or eligibility for activities," "removal from university housing," and "written notice or reprimand to the student that a violation … has occurred and that continued or repeated violations … may be cause for further disciplinary action." Other consequences could include "educational efforts, employment consequences, or educational consequences" and "informal counseling."

66. If the Title IX officer determines that "the reported conduct is not Prohibited Conduct," the officer may nevertheless "refer the matter to another office for review and resolution."

67. Campus Title IX officers are also required to "keep records of reports of Prohibited Conduct, and any actions taken in response to reports, including records" of "investigations, resolutions, and disciplinary action."

**D.    UC's SHAPE Training**

68. There is no question that UC schools will aggressively enforce violations of the SVSH Policy, including the Hostile-Environment Provision and FAQ #14. Students at UC System schools must complete mandatory training—the "Sexual

22

Harassment, Anti-Discrimination, Prevention and Education" (SHAPE) training—to ensure their understanding of the SVSH Policy. *See* Esther Wickham, *UC System Mandates Training Affirming Gender Ideology*, The Center Square (Nov. 3, 2025) perma.cc/6RKB-2VG7; Spencer Brown, *UC San Diego Requires Students to Embrace Radical Gender Ideology to Register for Classes*, YAF (Sept. 17, 2025) perma.cc/WD9K-4WLW.

69. When discussing supposed discrimination based on gender identity, the SHAPE training gives the following example:

> My name is Mona, and I am transgender. My classmate Jane continues to call me James, which was my name before I transitioned. Jane refers to me as a man and complains when I use the women's restroom. I've asked her to stop, but she does not. I feel very disrespected and want this to stop.

Students are asked to decide "what kind of prohibited conduct" the scenario describes. The correct answer to that question is "hostile environment." Students are not given the option to say that the speech is not harassment.

70. The SHAPE training further states that a "hostile environment may be created when someone demands that others use a particular bathroom that does not correspond to their gender identity or uses the incorrect pronoun." *Id.* It also explains that "[i]ntentionally calling someone their name used before transition, as opposed to their lived name, is called dead-naming, and may be a form of sexual harassment." *Id.*

71. All students—undergraduate, graduate, professional, and transfer—are required to complete the SHAPE training. Students must complete the training at least once per academic year. Students who do not complete the SHAPE training receive a

23

"hold" on their student account that can prevent them from registering for the upcoming semester, enrolling in classes, or using their campus's recreational facilities.

**E.    The University's "Anti-Discrimination" Policy**

72.    UC also issued a revised version of its "Anti-Discrimination" policy on December 1, 2025. The policy became effective on January 1, 2026. Like the SVSH Policy, the Anti-Discrimination Policy "applies at all University campuses," including UCLA, UCI, and UCSD.

73.    The Anti-Discrimination Policy similarly prohibits "harassment" through a "hostile environment" based on a person's membership in a "Protected Category." Protected categories include "race, religion, color, citizenship, national or ethnic origin, ancestry, sex (including pregnancy, childbirth, lactation or related medical conditions), gender, gender identity, gender expression, gender transition, sexual orientation, physical or mental disability (including having a history of a disability or being regarded as being disabled), medical condition (cancer-related or genetic characteristics), predisposing genetic information (including family medical history), marital status, age (at least 40 years of age in employment context), or veteran or military status."

74.    The Anti-Discrimination Policy is broader than the SVSH Policy. The Anti-Discrimination Policy states that it "addresses Harassment that is not covered under the University's Policy on Sexual Violence and Sexual Harassment."

24

**IV.    The Effect of UC's Policies on Defending Education's Members**

75.    Defending Education's members who attend UC System schools are suffering concrete injuries as a result of UC's unconstitutional actions. These students want to engage in speech covered by the SVSH Policy, but they credibly fear that the expression of their deeply held views will lead to punishment.

76.    Students A is a member of DE and is an incoming Senior at UCLA.

77.    Student A believes that people are either male or female. She does not believe that "gender identity" is a coherent category separate from biological sex. She does not believe people can switch between genders. She does not think it is appropriate to refer to someone using biologically inaccurate "preferred pronouns" or "chosen names." Using non-biological pronouns would conflict with her deeply held beliefs, both based on her religious views and biological reality.

78.    Student A has no ill-will towards people who identify as transgender or nonbinary, but she does not want to be forced to affirm that a biologically female classmate is actually a male—or vice versa—or that a classmate is "nonbinary" and neither male nor female. In fact, she thinks that affirming someone's non-biological "gender identity" is harmful to that person because it encourages him to believe a falsehood about himself and discourages him from seeking proper care to address his gender dysphoria.

79.    If Student A were to refer to a biological male as "she" instead of "he," she would be lying to herself and others, and she would be communicating an idea and

25

belief that she firmly disagrees with. In addition, Student A believes that using birth names and biologically accurate pronouns sends a powerful message and reminder that a person was born a male or a female and that cannot change based on their personal preferences. Being compelled to use an individual's preferred pronouns or names prevents Student A from expressing that core belief—and, in effect, surrenders the debate before it begins.

80.    Student A has many classmates who identify as transgender or nonbinary, and she regularly comes in contact with other members of the UCLA community who identify as transgender or nonbinary.

81.    When issues involving gender identity arise in class, on campus, or relating to school programs, Student A wants to speak about these topics and repeatedly state her belief that biological sex is immutable. For example, when gender issues come up in class, Student A wants to voice her view that a person cannot transition from one gender to another.

82.    In addition, Student A wishes to use pronouns and given names that are consistent with a classmate's biological sex, rather than the classmate's "preferred pronouns" or "chosen names"—*i.e.*, the pronouns and name the classmate has decided reflect the classmate's gender identity. She wants to refer to biological males as "he," not "she," and biological females as "she," not "he." She wishes to use the pronouns and names that are consistent with her classmates' biological sex repeatedly and at all times, including inside and outside the classroom, in the classmates' presence, and

when referring to the classmates outside their presence. For example, when participating in discussions during class, Student A wants to say, "I agree with *his* argument," when referring to a biological male classmate, even though he identifies himself with female pronouns. Student A understands that this speech will be considered "hostile," "aggressive," and "intimidating" to those who want to go by different pronouns. She has no ill will against those students, but she wants to express her deeply held views.

83.    Student A also believes that people should use the intimate spaces, like restrooms, locker rooms, and dorm rooms, that correspond to their biological sex. As a woman on campus, Student A regularly sees biological men using intimate spaces reserved for women and it makes her profoundly uncomfortable. She leaves the restroom when this happens and goes to find a different one. She would like to speak publicly about these topics and repeatedly state her view that spaces reserved for women should only be used by biological women.

84.    Student A also wants to communicate her beliefs about controversial topics, including gender identity, on a regular basis and using her personal phone, computer, and on social media. She wants to discuss these topics with other students and the broader UCLA community both on and off campus, including during off-campus events with no connection to any school-related activity.

85.    Student A self-censors, however, because she fears that expressing her belief that sex is immutable—by using biologically accurate pronouns or otherwise explaining her views—will cause her to be punished for violating UC policies.

86.    Student A is aware that she can be punished for "harassment" which is "unwelcome sexual or other sex-based conduct [that] is sufficiently severe, persistent or pervasive that it unreasonably denies, adversely limits, or interferes with a person's participation in or benefit from the education, employment or other programs or activities of the University and creates an environment that a reasonable person would find to be intimidating or offensive," and that "sex-based conduct" includes "acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on gender, gender identity, gender expression, sex- or gender-stereotyping, or sexual orientation." Student A is also aware that she can be punished for "intentional or repeated use of a name or pronoun inconsistent with an individual's gender identity."

87.    For example, Student A refrains from using pronouns and avoids conversations involving sex and gender in public because of UC's policies. When she is called on in class, Student A feels like she has no choice except to tell professors what they want to hear and phrase her answers as narrowly as possible, because she knows that openly expressing her convictions can lead to disciplinary action. She also avoids putting herself in a situation where conversations about gender identity might come up.

88.    For example, when asked her pronouns in online class discussion questions or in-class icebreakers, Student A skips the question and hope no one notices. And when she sees a biological man in the women's restroom, Student A leaves rather than voicing her opinion that those spaces should be reserved for women.

89.    Student A's fear of speaking out is informed by years of personal experience with UCLA and its officials. For example, Student A's professors often state their pronouns in their syllabi and ask students to share their pronouns at the start of class, and they do not leave room for other views on gender ideology. These actions, combined with Student A's knowledge of UC's harassment and anti-discrimination policies, create a university environment that makes her deeply uncomfortable and afraid to share her views.

90.    Student A was required to take UC's Sexual Harassment, Anti-Discrimination, Prevention and Education (SHAPE) training, which included discussion and quiz questions about the harassment and anti-discrimination policies. Because she delayed taking it, Student A was prevented from registering for classes on time.

91.    Student A is also aware that, according to UC, "intentionally and repeatedly call[ing]" another student by his or her "dead name" or biological pronouns is considered "deadnaming" and "misgendering," and constitutes harassment.

92.    Student A wants to be educated in an environment that involves the free exchange of ideas and to be free to express her beliefs, even if others disagree with them or find them offensive. She does not want to be forced to affirm beliefs about gender identity that are inconsistent with her deeply held convictions.

93.    Under UC's policies, however, Student A can be punished for the things she wants to say, including expressing opinions about the immutable nature of biological sex, using pronouns that are not a student's "preferred pronouns," disagreeing with

students' assertions about whether they are male or female, stating that biological males who identify as female should not be allowed to compete in women's sports, and expressing discomfort about sharing bathrooms and other intimate spaces with teachers or students of the opposite biological sex.

94.    Student A fears that she will be subjected to formal discipline unless she affirms ideas that are inconsistent with her deeply held beliefs. Such discipline for speech consistent with her deeply held convictions is detrimental to her school experience.

95.    Student A also fears that repeatedly being subject to discipline for stating her beliefs will subject her to reputational harm and personal attacks from other students and members of the UCLA community.

96.    Student A's fear of being disciplined for stating her beliefs has caused her emotional and psychological harm. It has caused her to question whether she should follow her conscience and faith, or remain silent and affirm viewpoints contrary to her beliefs.

97.    Student B is a member of DE and a Senior at UCSD. He is taking summer classes and will graduate at the end of the summer quarter.

98.    Student B believes that people are either male or female. He does not believe that "gender identity" is a coherent category separate from biological sex. He does not believe people can switch between genders. He does not think it is appropriate to refer to someone using biologically inaccurate "preferred pronouns" or "chosen

names." Using non-biological pronouns would conflict with his deeply held beliefs, based on his religious views, biological reality, and morality.

99.    Student B has no ill-will towards people who identify as transgender or nonbinary, but he does not want to be forced to affirm that a biologically female class-mate is actually a male—or vice versa—or that a classmate is "nonbinary" and neither male nor female. In fact, Student B thinks that affirming someone's non-biological "gender identity" is harmful to that person because it encourages him to believe a false-hood about himself and discourages him from seeking proper care to address his gen-der dysphoria.

100.    If Student B were to refer to a biological male as "she" instead of "he," he would be lying to himself and others, and he would be communicating an idea and belief that he firmly disagrees with. In addition, he believes that using birth names and biologically accurate pronouns sends a powerful message and reminder that a person was born a male or a female and that cannot change based on their personal prefer-ences. Being compelled to use an individual's preferred pronouns or names prevents Student B from expressing that core belief—and, in effect, surrenders the debate be-fore it begins.

101.    Student B regularly interacts with other students and members of the UCSD community who identify as transgender or nonbinary and has had a teaching assistant who identifies as transgender or nonbinary.

31

102.    When issues involving gender identity arise in class, on campus, or relating to school programs, Student B wants to speak about these topics and repeatedly state his belief that biological sex is immutable.

103.    In addition, Student B wishes to use pronouns and given names that are consistent with a classmate's biological sex, rather than the classmate's "preferred pronouns" or "chosen name"—*i.e.*, the pronouns and name the classmate has decided reflect the classmate's gender identity. He wants to refer to biological males as "he," not "she," and biological females as "she," not "he." He wishes to use the pronouns and names that are consistent with his classmates' and professors' biological sex repeatedly and at all times, including inside and outside the classroom, in the classmates' presence, and when referring to the classmates outside their presence. For example, when participating in discussions during on-campus activities, Student B wants to say, "I agree with *his* argument," when referring to a biological male classmate, even though he identifies himself with female pronouns. Student B understands that this speech will be considered "hostile," "aggressive," and "intimidating" to those who want to go by different pronouns. He has no ill will against those students, but he wants to express his deeply held views.

104.    Student B also believes that people should use the intimate spaces, like restrooms, locker rooms, and dorm rooms, that correspond to their biological sex. And Student B believes that women's sports should be reserved for biological women.

32

Student B would like to speak publicly about these topics and repeatedly state his view that spaces reserved for women should only be used by biological women.

105. Student B also wants to communicate his beliefs about controversial topics, including gender identity, on a regular basis and using his personal phone, computer, and on social media. He wants to discuss these topics with other students and the broader UCSD community both on and off campus, including during off-campus events with no connection to any school-related activity.

106. Student B participates in many discussions about UCSD in online communities, and he wants to voice his opinion on these topics without fear that he might be reported for violating UC's policies. For example, when gender issues come up in online discussions, Student B wants to voice his view that sex is immutable and that a person cannot transition from one gender to another. In online debates about men who identify as women participating in women's sports, he wants to say, "It is unfair for him to participate because men are bigger, faster, and stronger on average, and his participation makes women's sports unsafe for women."

107. Student B self-censors, however, because he fears that expressing his belief that sex is immutable—by using biologically accurate pronouns or otherwise explaining his views—will cause him to be punished for violating UC's policies.

108. Student B is aware that he can be punished for "harassment" which is "unwelcome sexual or other sex-based conduct [that] is sufficiently severe, persistent or pervasive that it unreasonably denies, adversely limits, or interferes with a person's

33

participation in or benefit from the education, employment or other programs or activities of the University and creates an environment that a reasonable person would find to be intimidating or offensive," and that "sex-based conduct" includes "acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on gender, gender identity, gender expression, sex- or gender-stereotyping, or sexual orientation." Student B is also aware that he can be punished for "intentional or repeated use of a name or pronoun inconsistent with an individual's gender identity."

109.    For example, Student B refrains from using pronouns and avoids conversations involving sex and gender in public because of UC's policies. When he is called on in class, he feels like he has no choice except to tell professors what they want to hear and phrase his answers as narrowly as possible, because he knows that openly expressing his convictions can lead to disciplinary action. Student B is often asked about his pronouns in campus-related programs, and he refrains from answering and hopes no one notices. He never states his true view that gender cannot change.

110.    When talking with students who have preferred pronouns different from their biological pronouns, Student B avoids using pronouns altogether. And when discussions about gender come up on online forums, he participates by encouraging civility and dialogue, but he avoids sharing his own views.

111.    Student B's fear of speaking out is informed by years of personal experience with UCSD and its officials. For example, he witnessed students vandalize posters advertising an event on campus about boys in girls' sports by covering the posters in

34

stickers depicting Charlie Kirk's death, and others online celebrate the vandalism. The lack of response from UCSD to his fellow classmates' attempt to have a reasonable discussion about this salient issue, combined with his knowledge of UC's harassment and anti-discrimination policies, create a university environment that makes him deeply uncomfortable and afraid to share his views.

112. Student B was required to take UC's Sexual Harassment, Anti-Discrimination, Prevention and Education (SHAPE) training, which included discussion and quiz questions about the harassment and anti-discrimination policies. Student B was informed that if he did not take the training, he would be unable to register for classes.

113. Student B is also aware that, according to UC, "intentionally and repeatedly call[ing]" another student by his or her "dead name" or biological pronouns is considered "deadnaming" and "misgendering," and constitutes harassment.

114. Student B wants to be educated in an environment that involves the free exchange of ideas and to be free to express his beliefs, even if others disagree with them or find them offensive. He does not want to be forced to affirm beliefs about gender identity that are inconsistent with his deeply held convictions. He also wants to engage in robust debate on these issues with campus organizations and other students.

115. Under UC's policies, however, Student B can be punished for the things he wants to say, including expressing opinions about the immutable nature of biological sex, using pronouns that are not a student's "preferred pronouns," disagreeing with students' assertions about whether they are male or female, stating that biological males

who identify as female should not be allowed to compete in women's sports, and expressing discomfort about sharing bathrooms and other intimate spaces with teachers or students of the opposite biological sex.

116.    Student B fears that he will be subjected to formal discipline unless he affirms ideas that are inconsistent with his deeply held beliefs. Such discipline for speech consistent with his deeply held convictions is detrimental to his school experience.

117.    Student B also fears that repeatedly being subject to discipline for stating his beliefs will subject him to reputational harm and personal attacks from other students and members of the UCSD community.

118.    Student B's fear of being disciplined for stating his beliefs has caused him emotional and psychological harm. It has caused him to question whether he should follow his conscience and faith or remain silent and affirm viewpoints contrary to his beliefs.

119.    Student C is a member of DE and a Junior at UCI. He is attending classes over the summer and will begin his Senior year at UCI in the fall.

120.    Student C believes that people are either male or female. He does not believe that "gender identity" is a coherent category separate from biological sex. He does not believe people can switch between genders. He does not think it is appropriate to refer to someone using biologically inaccurate "preferred pronouns" or "chosen names." Using non-biological pronouns or chosen names would conflict with his

36

deeply held beliefs, based on biological reality, his understanding of natural law, and his family traditions.

121.    Student C has no ill-will towards people who identify as transgender or nonbinary, but he does not want to be forced to affirm that a biologically female classmate is actually a male—or vice versa—or that a classmate is "nonbinary" and neither male nor female. In fact, Student C thinks that affirming someone's non-biological "gender identity" is harmful to that person because it encourages him to believe a falsehood about himself.

122.    If Student C were to refer to a biological male as "she" instead of "he," he would be lying to himself and others, and he would be communicating an idea and belief that he firmly disagrees with. In addition, he believes that using birth names and biologically accurate pronouns sends a powerful message and reminder that a person was born a male or a female and that cannot change based on their personal preferences. Being compelled to use an individual's preferred pronouns or names prevents Student C from expressing that core belief—and, in effect, surrenders the debate before it begins.

123.    Student C regularly interacts with other students and members of the UCI community who identify as transgender or nonbinary and has had at least one transgender or nonbinary student in each class he has taken at UCI.

124.    When issues involving gender identity arise in class, on campus, or relating to school programs, Student C wants to speak about these topics and repeatedly

37

state his belief that biological sex is immutable. For example, when gender issues come up in class, he wants to voice his view that a person cannot transition from one gender to another.

125.    In addition, Student C wishes to use pronouns and given names that are consistent with a classmate's biological sex, rather than the classmate's "preferred pronouns" or "chosen name"—*i.e.*, the pronouns and name the classmate has decided reflect the classmate's gender identity. Student C wants to refer to biological males as "he," not "she," and biological females as "she," not "he." Student C wishes to use the pronouns and names that are consistent with his classmates' and professors' biological sex repeatedly and at all times, including inside and outside the classroom, in the classmates' presence, and when referring to the classmates outside their presence. For example, when participating in discussions during class, Student C wants to say, "I agree with *his* argument," when referring to a biological male classmate, even though he identifies himself with female pronouns. He understands that this speech will be considered "hostile," "aggressive," and "intimidating" to those who want to go by different pronouns. He has no ill will against those students, but he wants to express his deeply held views.

126.    Student C also believes that people should use the intimate spaces, like restrooms, locker rooms, and dorm rooms, that correspond to their biological sex. And he believes that women's sports should be reserved for biological women. He sees it as his duty to stand up for biological women who have been forced to share intimate

spaces with biological men on campus. He would like to speak publicly about these topics and repeatedly state his view that spaces reserved for women should only be used by biological women. He wants to vocally criticize school policies on bathroom usage when he sees biological men who identify as women using the women's bathroom by saying, "He doesn't understand the fear that women have when biological men are present in the women's bathroom."

127.   Student C also wants to communicate his beliefs about controversial topics, including gender identity, on a regular basis and using his personal phone, computer, and on social media. He wants to discuss these topics with other students and the broader UCI community both on and off campus, including during off-campus events with no connection to any school-related activity.

128.   Student C self-censors, however, because he fears that expressing his belief that sex is immutable—by using biologically accurate pronouns or otherwise explaining his views—will cause him to be punished for violating UC's policies.

129.   Student C is aware that he can be punished for "harassment" which is "unwelcome sexual or other sex-based conduct [that] is sufficiently severe, persistent or pervasive that it unreasonably denies, adversely limits, or interferes with a person's participation in or benefit from the education, employment or other programs or activities of the University and creates an environment that a reasonable person would find to be intimidating or offensive," and that "sex-based conduct" includes "acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on gender,

gender identity, gender expression, sex- or gender-stereotyping, or sexual orientation." He is also aware that he can be punished for "intentional or repeated use of a name or pronoun inconsistent with an individual's gender identity."

130.    For example, Student C refrains from using pronouns and avoids conversations involving sex and gender in public because of UC's policies. He is often in classes and small groups with people who identify as transgender or nonbinary and must work hard to avoid pronouns or names in those situations. In small groups, he avoids using names or pronouns by looking at transgender-identifying people and referring to them as "you."

131.    When Student C is called on in class, he feels like he has no choice except to tell professors what they want to hear and phrase his answers as narrowly as possible, because he knows that openly expressing his convictions can lead to disciplinary action. Student C is often asked about his pronouns in class and other campus-related programs, and he answers by saying that he is a man. He would like to be able to voice his belief that those types of questions are unnecessary and assume something he does not believe, but he is afraid that doing so will violate UC's policies. When he gives his pronouns instead of stating his true views, he feels that he is conforming to their language and beliefs.

132.    Student C would like to encourage debate about these issues in groups he is involved in on campus, but he is worried about other students getting in trouble for violating UC's policies, so he does not have events where gender discussions would

40

come up. If this policy did not exist, his groups would immediately host discussions on these topics.

133. Student C's fear of speaking out is informed by personal experience with UCI and its officials. For example, professors regularly ask students' pronouns in class, but do not give them the opportunity to opt out or share their true beliefs. This, combined with his knowledge of UC's harassment and anti-discrimination policies, creates a university environment that makes Student C deeply uncomfortable and afraid to share his views.

134. Student C was required to take UC's Sexual Harassment, Anti-Discrimination, Prevention and Education (SHAPE) training, which included discussion and quiz questions about the harassment and anti-discrimination policies. He was informed that if he did not take the training, he would be unable to register for classes.

135. Student C is also aware that, according to UC, "intentionally and repeatedly call[ing]" another student by his or her "dead name" or biological pronouns is considered "deadnaming" and "misgendering," and constitutes harassment.

136. Student C wants to be educated in an environment that involves the free exchange of ideas and to be free to express his beliefs, even if others disagree with them or find them offensive. He does not want to be forced to affirm beliefs about gender identity that are inconsistent with his deeply held convictions. Student C also wants to engage in robust debate on these issues with campus organizations and other students.

41

137. Under UC's policies, however, Student C can be punished for the things he wants to say, including expressing opinions about the immutable nature of biological sex, using pronouns that are not a student's "preferred pronouns," disagreeing with students' assertions about whether they are male or female, stating that biological males who identify as female should not be allowed to compete in women's sports, and expressing discomfort about sharing bathrooms and other intimate spaces with teachers or students of the opposite biological sex.

138. Student C fears that he will be subjected to formal discipline unless he affirms ideas that are inconsistent with his deeply held beliefs. Such discipline for speech consistent with his deeply held convictions is detrimental to his school experience.

139. Student C also fears that repeatedly being subject to discipline for stating his beliefs will subject him to reputational harm and personal attacks from other students and members of the UCI community.

140. Student C's fear of being disciplined for stating his beliefs has caused him emotional and psychological harm. It has caused him to question whether he should follow his conscience, or remain silent and affirm viewpoints contrary to his beliefs.

141. Student D is a member of DE and an outgoing Sophomore at UCI. She is taking summer courses and will begin her Junior year at UCI in the fall.

142. Student D holds scientific and objective views on matters of sex and gender. In particular, she believes that people are either male or female. Student D does

42

not believe that "gender identity" is a coherent category separate from biological sex. She does not believe people can switch between genders. She does not think it is appropriate to refer to someone using biologically inaccurate "preferred pronouns" or "chosen names." Using non-biological pronouns or chosen names would conflict with her deeply held beliefs, which are based on biological reality, including what she has learned in her studies on campus.

143.   Student D has no ill-will towards people who identify as transgender or nonbinary, but she does not want to be forced to affirm that a biologically female classmate is actually a male—or vice versa—or that a classmate is "nonbinary" and neither male nor female. In fact, from a young age, the topic of gender identity was a part of Student D's education experience, and watching young classmates struggle with their identity has made her believe affirming someone's non-biological "gender identity" is harmful to that person and only creates confusion. She believes that referring to people by names and pronouns that do not reflect biological reality encourages them to believe a falsehood about themselves and discourages them from seeking proper care to address their gender dysphoria.

144.   If Student D were to refer to a biological male as "she" instead of "he," she would be lying to herself and others, and she would be communicating an idea and belief that she firmly disagrees with. In addition, she believes that using birth names and biologically accurate pronouns sends a powerful message and reminder that a person was born a male or a female and that cannot change based on their personal

preferences. Being compelled to use an individual's preferred pronouns or names prevents Student D from expressing that core belief—and, in effect, surrenders the debate before it begins.

145.    Student D regularly interacts with other students and members of the UCI community who identify as transgender or nonbinary and has had classes with students who identify as transgender or nonbinary.

146.    When issues involving gender identity arise in class, on campus, or relating to school programs, Student D wants to speak about these topics and repeatedly state her belief that biological sex is immutable. For example, when gender issues come up in class, she wants to voice her view that a person cannot transition from one gender to another.

147.    In addition, Student D wishes to use pronouns and given names that are consistent with a classmate's biological sex, rather than the classmate's "preferred pronouns" or "chosen name"—*i.e.*, the pronouns and name the classmate has decided reflect the classmate's gender identity. She wants to refer to biological males as "he," not "she," and biological females as "she," not "he." She wishes to use the pronouns and names that are consistent with her classmates' and professors' biological sex repeatedly and at all times, including inside and outside the classroom, in the classmates' presence, and when referring to the classmates outside their presence. For example, when participating in class discussions, Student D wants to say, "I agree with *his* argument," when referring to a biological male classmate, even though he identifies himself

with female pronouns. She understands that this speech will be considered "hostile," "aggressive," and "intimidating" to those who want to go by different pronouns. She has no ill will against those students, but she wants to express her deeply held views.

148.    Student D also believes that people should use the intimate spaces, like restrooms, locker rooms, and dorm rooms, that correspond to their biological sex. As a woman on campus, Student D avoids using public restrooms on campus in part because she is uncomfortable with men being allowed in the women's restroom. Student D would like to speak publicly about these topics and repeatedly state her view that spaces reserved for women should only be used by biological women.

149.    Student D also wants to communicate her beliefs about controversial topics, including gender identity, on a regular basis and using her personal phone, computer, and on social media. She wants to discuss these topics with other students and the broader UCI community both on and off campus, including during off-campus events with no connection to any school-related activity.

150.    Student D self-censors, however, because she fears that expressing her belief that sex is immutable—by using biologically accurate pronouns or otherwise explaining her views—will cause her to be punished for violating UC's policies.

151.    Student D is aware that she can be punished for "harassment" which is "unwelcome sexual or other sex-based conduct [that] is sufficiently severe, persistent or pervasive that it unreasonably denies, adversely limits, or interferes with a person's participation in or benefit from the education, employment or other programs or

45

activities of the University and creates an environment that a reasonable person would find to be intimidating or offensive," and that "sex-based conduct" includes "acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on gender, gender identity, gender expression, sex- or gender-stereotyping, or sexual orientation." She is also aware that she can be punished for "intentional or repeated use of a name or pronoun inconsistent with an individual's gender identity."

152.   For example, Student D refrains from using pronouns and avoids conversations involving sex and gender in public because of UC's policies. Student D is often in classes and small groups with people who identify as transgender or nonbinary and must work hard to avoid pronouns or names in those situations. When she is called on in class, she feels like she has no choice except to tell professors what they want to hear and phrase her answers as narrowly as possible, because she knows that openly expressing her convictions can lead to disciplinary action.

153.   Though she tries to avoid pronoun use altogether, Student D has occasionally slipped up. In one class discussion, she referred to a transgender-identifying student with biological pronouns. Her classmates gave her dirty looks and whispered about her. Another time, while at a social event on campus, she was unaware that two other students preferred pronouns different from their biological sex. When she said something like "I liked *her* artwork," those students refused to allow her to continue the conversation until she apologized. Student D fears that in situations like this, these students could report her, and she could get in trouble for violating UC's policy.

154. Student D would like to encourage debate about these issues in groups she is involved in on campus, but Student D is worried about other students getting in trouble for violating UC's policies, so she does not have events where this topic could come up. If this policy did not exist, her groups would immediately host discussions on these topics.

155. Student D's fear of speaking out is informed by years of personal experience with UCI and its officials. For example, when student groups have brought controversial speakers to campus, posters were vandalized and ripped down. The lack of response from UCI, combined with her knowledge of UC's harassment and anti-discrimination policies, creates a university environment that makes Student D deeply uncomfortable and afraid to share her views.

156. Student D was required to take UC's Sexual Harassment, Anti-Discrimination, Prevention and Education (SHAPE) training, which included discussion and quiz questions about the harassment and anti-discrimination policies. She was informed that if she did not take the training, she would be unable to register for classes.

157. Student D is also aware that, according to UC, "intentionally and repeatedly call[ing]" another student by his or her "dead name" or biological pronouns is considered "deadnaming" and "misgendering," and constitutes harassment.

158. Student D wants to be educated in an environment that involves the free exchange of ideas and to be free to express her beliefs, even if others disagree with them or find them offensive. Student D does not want to be forced to affirm beliefs

47

about gender identity that are inconsistent with her deeply held convictions. She also wants to engage in robust debate on these issues with campus organizations and other students.

159. Under UC's policies, however, Student D can be punished for the things she wants to say, including expressing opinions about the immutable nature of biological sex, using pronouns that are not a student's "preferred pronouns," disagreeing with students' assertions about whether they are male or female, stating that biological males who identify as female should not be allowed to compete in women's sports, and expressing discomfort about sharing bathrooms and other intimate spaces with teachers or students of the opposite biological sex.

160. Student D fears that she will be subjected to formal discipline unless she affirms ideas that are inconsistent with her deeply held beliefs. Such discipline for speech consistent with her deeply held convictions is detrimental to her school experience.

161. Student D also fears that repeatedly being subject to discipline for stating her beliefs will subject her to reputational harm and personal attacks from other students and members of the UCI community.

162. Student D's fear of being disciplined for stating her beliefs has caused her emotional and psychological harm. It has caused her to question whether she should follow her conscience or remain silent and affirm viewpoints contrary to her beliefs.

## COUNT I
### Violation of the First Amendment: Compelled Speech

163.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

164.    The Supreme Court has "held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus*, 585 U.S. at 892 (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. 624, 642 (1943). "The First Amendment mandates that [courts] presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 790-91 (1988). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus*, 585 U.S. at 892.

165.    Here, the Hostile-Environment Provision and FAQ #14 unconstitutionally compel speech because they forbid students from referring to a person according to their biological sex rather than their gender identity.

166.    Students A-D believe that biological sex is inherent and immutable. They bear no ill will towards others, but they do not want to be forced to affirm that a

biologically male student is actually a female—or vice versa—or that another student is neither male nor female because doing so would contradict their deeply held beliefs. For many of them, those beliefs are inseparable from their religious convictions. Yet that is exactly what UC's policies require.

167.   *Bates v. Pakseresht* is directly on point. There, the State of Oregon required prospective adoptive parents to agree to "respect, accept, and support" a child's gender identity and gender expression by using preferred pronouns. 146 F.4th at 776. When a prospective adoptive parent objected to "affirming a child's transgender identity" based on her sincerely held beliefs, her application was denied. *Id.* at 781. The Ninth Circuit held that a "preferred pronouns" policy "quite clearly … compels speech" and was likely unconstitutional. 146 F.4th at 785-86, 801. It explained that under the policy, "parental speech that promotes the state's conceptions of sexual orientation and gender identity is required, and speech that contradicts the state's views is prohibited." *Id.* at 785. "The situation would be no different if the state had restricted parental speech favoring more 'progressive' views of sexuality and gender identity, while compelling speech along the lines of [Plaintiff's] more traditional understanding." Either way, the state would "inevitably both restric[t] and compe[l] speech." *Id.* at 785-86.

168.   The Sixth Circuit has reached the same conclusion in two separate decisions. In *Meriwether v. Hartop*, that court held that a similar "preferred pronoun" for college professors was "anathema to the principles underlying the First Amendment." *Id.* at 510. "Indeed, the premise that gender identity is an idea 'embraced and advocated

50

by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view.'" *Id.* (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000)); *see also Green*, 52 F.4th at 784-85 & n.12. And in *Defending Education v. Olentangy*, the en banc Sixth Circuit explained that a K-12 "school district may not skew th[e] debate" over "biological pronouns" by "forcing one side to change the way it conveys its message or by compelling it to express a different view." 158 F.4th at 738. Simply put, "[p]ronouns can and do convey a powerful message implicating a sensitive topic of public concern," so policies that require the use of preferred pronouns or other transgender-affirming terms unconstitutionally compel students "to communicate a messag[e] [that] [p]eople can have a gender identity inconsistent with their sex at birth." *Meriwether*, 992 F.3d at 507-08.

169.    So too here. UC cannot force DE's members to "mouth support" for beliefs they do not hold, especially for "controversial subjects" like "gender identity." *Janus*, 585 U.S. at 892, 913. If anything, the First Amendment interests at stake are greater here than in both *Meriwether* and *Olentangy* because this case concerns college students, not professors or K-12 students. *See Olentangy*, 158 F.4th at 758 (a professor's "*on-the-job* speech" receives less protection than "'personal expression' that students use"); *R.W. v. Columbia Basin College*, 572 F. Supp. 3d 1010, 1026 (E.D. Wash. 2021) ("[U]niversity students enjoy more First Amendment protections than school-age children.").

170. That the SVSH Policy does not literally require students to speak is of no moment. Using pronouns is a "'virtual necessity'" for engaging in any conversation. *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1325 (M.D. Ala. 2019) (quoting *Wooley*, 430 U.S. at 715). The Policy prohibits students "from speaking in accordance with [their] belief that sex and gender are conclusively linked," and trying not to "use any pronouns" would be "impossible to comply with." *Meriwether*, 992 F.3d at 517. UC thus "cannot force [students] to choose between carrying a government message" and remaining silent in another student's presence at school. *Doe 1*, 367 F. Supp. 3d at 1326; *see also Wooley*, 430 U.S. at 715 (state cannot require message on license plates, even though no one is required to drive); *Hurley*, 515 U.S. at 575-76 (parade organizers cannot be forced to include certain groups in a parade, even though no one is required to hold a parade).

171. To the extent that the Anti-Discrimination Policy is coterminous with the SVSH Policy and compels the Students' speech, that policy also violates the First Amendment for the same reasons as the SVSH Policy.

172. Defendants adopted these policies "under color of state law" and are acting "under color of state law" within the meaning of §1983.

**COUNT II**
**Violation of the First Amendment:**
**Content- and Viewpoint-Based Discrimination**

173. Plaintiff repeats and realleges each of the prior allegations in this complaint.

174. The Hostile-Environment Provision and FAQ #14 are viewpoint- and content-based restrictions on speech in violation of the First Amendment.

175. "If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991).

176. Speech restrictions "based on viewpoint are prohibited." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018); *see also e.g.*, *Iancu v. Brunetti*, 588 U.S. 388, 398-99 (2019); *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893 (6th Cir. 2021) ("But the government may not engage in a more invidious kind of content discrimination known as viewpoint discrimination." (cleaned up)); *Shurtleff v. City of Bos.*, 596 U.S. 243, 258 (2022) (viewpoint discrimination prohibited); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022) ("Restrictions … based on viewpoint are prohibited, seemingly as a per se matter." (cleaned up)).

177. Content-based regulations similarly are "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Accordingly, "any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009); *see, e.g.*, *Westfield High School L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 123 (D. Mass. 2003) (school policy allowing only "responsible" speech was a content-based regulation subject to strict scrutiny).

178.    Here, the Hostile-Environment Provision and FAQ #14 punish students for the content and viewpoint of their speech. The Hostile-Environment Provision bars "offensive" speech, *e.g.*, speech that is "hostile," "unwelcome," "aggress[ive]" or "intimidat[ing]" towards someone based on "gender, gender identity, gender expression, sex- or gender-stereotyping, or sexual orientation." It is well-established that giving offense is a viewpoint, such that an offense-triggered policy like this one is viewpoint-discriminatory. *See, e.g.*, *Matal v. Tam*, 582 U.S. 218, 243 (2017); *Iancu*, 588 U.S. at 394. Plus, because the hostile-environment standard turns on membership in the Policy's protected categories, it effectively prohibits statements critical of a named group while permitting supportive statements: A statement that *affirms* someone's gender identity is allowed, but a statement that makes them feel *unwelcome* is not. "'It is difficult to imagine'" a *more* viewpoint-discriminatory policy than one that allows "'laudatory'" speech "'while prohibiting a different point of view (negatively critical) on a particular subject matter.'" *Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1184 (D.N.M. 2014).

179.    The Hostile-Environment Provision is also content-discriminatory because it turns on "[l]isteners' reaction to speech." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992). If a fellow student or other university community member *feels* unwelcome or intimidated by someone's speech, that person has violated the Policy.

180.    The Hostile-Environment Provision and FAQ #14 also discriminate based on both viewpoint and content because they prohibit "misgendering" and

54

"deadnaming" and the Hostile-Environment Provision prohibits students from expressing the view that biological distinctions between males and females should be respected, *e.g.*, by maintaining separate bathrooms or other facilities for each biological sex. This is classic content-based and viewpoint-based regulation of speech. *See, e.g.*, *Bates*, 146 F.4th at 786-87 (preferred pronoun policies regulate "based on content and viewpoint"); *Meriwether*, 992 F.3d at 506-07 ("the state cannot wield its authority to categorically silence dissenting viewpoints" on sex and gender).

181. Viewpoint-based restrictions are necessarily unconstitutional. *See 303 Creative v. Elenis*, 600 U.S. 570, 588-89 (2023) (Using government policies to "excise certain ideas or viewpoints from the public dialogue" is "more than enough … to represent an impermissible abridgement of the First Amendment's right to speak freely." (cleaned up)). Even if the SVSH Policy were merely content-based, UC has no compelling interest in suppressing this type of speech, and even if it did, the restrictions are not narrowly tailored to further that interest. *See Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 192 (2021); *Willson v. City of Bel-Nor*, 924 F.3d 995, 1001 (8th Cir. 2019).

182. *Bates* is again directly on point. There, in order to be eligible to adopt children through foster care, parents were required to "reinforce the state's perspective of sexuality and gender identity as evolving concepts, while withholding contrary views that are less embracing of same-sex relationships and a conception of gender identity that does not align with biological sex." 146 F.4th at 785. The same is true here:

55

students are required to mouth support for the state's view that gender identity is evolving, and they are prohibited from voicing their own view that gender is static. Such a law "clearly restricts and compels speech based on content and viewpoint." *Id.*

183.    To the extent that the Anti-Discrimination Policy is coterminous with the SVSH Policy and prohibits the Students' speech, that policy also violates the First Amendment for the same reasons as the SVSH Policy.

184.    Defendants adopted these policies "under color of state law" and are acting "under color of state law" within the meaning of §1983.

## COUNT III
### Violation of the First Amendment: Overbreadth

185.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

186.    The First Amendment prohibits public universities from adopting regulations of students that are "so broad as to 'chill' the exercise of free speech and expression." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1182 (6th Cir 1995) (finding university harassment policy unconstitutionally overbroad). "'Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.'" *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). Schools must carefully craft their regulations "to punish only unprotected speech and not be susceptible of application to protected expression." *Id.* A policy is overbroad "if it prohibits

56

a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008).

187. The Hostile-Environment Provision and FAQ #14 are unconstitutionally overbroad.

188. "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe*, 240 F.3d at 204. While universities can prohibit genuinely harassing *conduct*, they do not have unlimited authority to punish *protected speech*. To comply with the First Amendment, harassment policies must be limited to conduct that is "so severe, pervasive, *and* objectively offensive that it *denies* its victims the equal access to education." *Davis v. Monroe County Board of Education*, 526 U.S. 629, 652 (1999) (emphases added).

189. The Hostile-Environment Provision comes nowhere close to satisfying the *Davis* standard. Instead of targeting only conduct that is sufficiently "severe, pervasive *and* objectively offensive," *Davis*, 526 U.S. at 652 (emphasis added), the Policy asks whether the conduct is "severe, persistent *or* pervasive." And instead of punishing such activity only when it "*denies*" other students "equal access to education," *id.* (emphasis added), the Policy asks whether the conduct "denies, adversely limits," or even just "interferes" with a students' education, employment, or other UC activities or programs.

190. Policies that fail to honor the line drawn by *Davis* are unconstitutionally overbroad because they sweep in "a substantial amount of speech that is

57

constitutionally protected." *Forsyth County*, 505 U.S. at 130. Courts regularly find these types of far-reaching policies to be unconstitutionally overbroad. *See, e.g., Saxe*, 240 F.3d at 215-16 (finding that a high school speech policy punishing "harassment" was overbroad because it "prohibit[ed] substantially more conduct than would give rise to liability under" *Davis*); *Alabama v. Sec'y of Educ.*, 2024 WL 3981994, *6 (11th Cir. Aug, 22, 2024) (finding that a policy that "contravenes" the *Davis* standard "runs headlong into the First Amendment concerns animating" that decision).

191. Consider the statement: "I have no ill-will toward you, but you are not a boy/girl. People are created either male or female and so you can never transition from one sex to another." This is protected speech, yet it would be seen by a transgender listener as "hostile," "unwelcome," "aggress[ive]" and "intimidat[ing]."

192. Consider, too, other speech the Students want to engage in: They want to express opinions about the immutable nature of biological sex, state that biological males who identify as female should not be allowed to compete in women's sports, express discomfort about sharing bathrooms with teachers or students of the opposite biological sex, and use pronouns and given names, among other things. This is likewise prohibited speech, yet these statements too would violate the Hostile-Environment Provision and FAQ #14.

193. For FAQ #14 in particular, the unconstitutional applications of its ban on non-gender-affirming speech aren't just substantial relative to any legitimate applications; they are substantial "in an absolute sense" too. *Williams*, 553 U.S. at 292.

58

Coercing and prohibiting speech on biological pronouns, "a sensitive topic of public concern," *Meriwether*, 992 F.3d at 508, is the Policy's "heartland applicatio[n]," *Moody v. NetChoice*, 603 U.S. 707, 744 (2024).

194.    In addition, the Hostile-Environment Provision and FAQ #14 apply to off-campus speech, including by students on personal devices, even if it is not for school-related activities or programs. But the Supreme Court in *Mahanoy* made clear that school policies prohibiting off campus speech are constitutionally suspect. "When it comes to political or religious speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention." 594 U.S. at 190. This is especially true for university students. *See, e.g.*, *Diei v. Boyd*, 116 F.4th 637, 645-46 (6th Cir. 2024); *Cartwright*, 32 F.4th at 1127 n.6. The extension of these prohibitions to off-campus speech sweeps in "a substantial amount of speech that is constitutionally protected" and thus is unconstitutionally overbroad. *Forsyth County*, 505 U.S. at 130.

195.    To the extent that the Anti-Discrimination Policy is coterminous with the SVSH Policy and prohibits the Students' speech, that policy also violates the First Amendment for the same reasons as the SVSH Policy.

196.    Defendants adopted this Policy "under color of state law" and are acting "under color of state law" within the meaning of §1983.

**COUNT IV**
**Violation of the First and Fourteenth Amendments:**
**Void for Vagueness**

197.   Plaintiff repeats and realleges each of the prior allegations in this complaint.

198.   "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A policy "must be sufficiently clear so as to allow persons of 'ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998). Vague policies run the risk of "punishing people for behavior that they could not have known was illegal," "subjective enforcement … based on 'arbitrary and discriminatory enforcement' by government officers" and having a "chilling effect on the exercise of First Amendment freedoms." *Id.*; *see also Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 668-69 (8th Cir. 2023).

199.   A policy "which either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)). And "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis." *Grayned*, 408 U.S. at 108-09; *see also*

60

*Foti*, 146 F.3d at 639. Thus, policies that require officials to "evaluate a myriad of factors," creating a "danger" that they "might resort to enforcing [the policies] only against … messages" they "dislik[e]," violate the First and Fourteenth Amendments. *Foti*, 146 F.3d at 639.

200.    Moreover, clarity is especially important here. "[W]hen First Amendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required." *Foti*, 146 F.3d at 638; *see also Vill. of Hoffman Est. v. Flipside, Hoffman Est., Inc.*, 455 U.S. 489, 499 (1982) (If the challenged policy "interferes with the right of free speech or of association, a more stringent vagueness test should apply.").

201.    The Hostile-Environment Provision, among other things, turns on unpredictable assessments about whether student speech is sufficiently "hostil[e]," "aggressi[ve]" or "intimidat[ing]." Those terms are undefined and subjective. They "beg for clarification." *Fenves*, 979 F.3d at 332 & n.9. For example, the policy defines "hostile environment" to include "unwelcome … sex-based conduct," which in turn is defined as "aggression, intimidation, or hostility based on" a protected characteristic. Indeed, it circularly defines "hostile environment" to include "hostility."

202.    Moreover, the SVSH Policy encompasses speech on and off campus, including speech that has "continuing adverse effects on" UC properties or programs.

203.    Indeed, UC itself acknowledges that "a broad spectrum of conduct … may" or may not "be appropriately charged" under the Policy, depending on whether and how a Title IX officer "consider[s]" a non-exhaustive list of "surrounding

circumstances." According to UC, whether particular conduct or speech constitutes hostile-environment harassment "depend[s] on the circumstances," including factors "like" the "severity of the conduct," "where the conduct occurred," "contemporaneous statements or other behavior by the Respondent," and "the relationship between the parties (for example, whether there is a power imbalance)." UC says it will consider "other relevant factors" too, but it does not say what those factors are. Any given conduct or speech "might" or might not "be charged as sexual harassment" depending on whether and how a Title IX officer weighs these circumstances.

204. The Policy's vague standards deprive students of "a reasonable opportunity to understand what conduct [the policies] prohibit[]." *Hill v. Colorado*, 530 U.S. 730, 732 (2002). The Policy is also "susceptible to discriminatory or arbitrary enforcement." *Bell v. Keating*, 697 F.3d 445, 462 (7th Cir. 2012); *Foti*, 146 F.3d at 639.

205. To the extent that the Anti-Discrimination Policy is coterminous with the SVSH Policy and prohibits the Students' speech, that policy also violates the First Amendment for the same reasons as the SVSH Policy.

206. Defendants adopted the SVSH Policy "under color of state law" and are acting "under color of state law" within the meaning of §1983.

**WHEREFORE**, Defending Education respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants and provide the following relief:

62

A. A declaratory judgment that the Hostile-Environment Provision and FAQ #14—and any materially similar policy, provision, or law that applies at UC System schools—violate the First and Fourteenth Amendments;

B. A preliminary and permanent injunction barring Defendants from enforcing the Hostile-Environment Provision and FAQ #14 and any materially similar policy, provision, or law that applies at UC System schools;

C. A preliminary and permanent injunction barring Defendants from compelling speech to affirm another person's gender identity or punishing students for referring to another person using pronouns that are consistent with the other person's birth sex but inconsistent with that person's gender identity;

D. A preliminary and permanent injunction barring Defendants from enforcing the Hostile-Environment Provision and FAQ #14 to punish students for speech occurring off school grounds that is not for or during a school-sponsored activity;

E. Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, per 42 U.S.C. §1988 and all other applicable laws; and

F. All other relief that Plaintiff is entitled to.

63

Dated: June 18, 2026

Respectfully submitted,

*/s/ John M. Begakis*
**ALTVIEW LAW GROUP LLP**
John M. Begakis (Cal. Bar No. 278681)
9454 Wilshire Blvd., Suite 825
Beverly Hills, CA 90212
(310) 230-5580
john@altviewlawgroup.com

*Local Counsel*

*/s/ J. Michael Connolly*
**CONSOVOY MCCARTHY PLLC**
J. Michael Connolly (PHV forthcoming)
Paul R. Draper (Cal. Bar No. 345071)
　(C.D. Cal. bar application pending)
Marie E. Sayer (PHV forthcoming)
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
mike@consovoymccarthy.com
paul@consovoymccarthy.com
mari@consovoymccarthy.com

*Counsel for Plaintiff*

**VERIFICATION**

I, Sarah Perry, declare as follows:

1.      I am the Vice President and Senior Legal Fellow of Defending Education, the plaintiff in this case.

2.      I have reviewed this complaint.

3.      For the allegations within my personal knowledge, I believe them all to be true.

4.      For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on my conversations with members of Defending Education, including Students A, B, C, and D.

5.      I declare under penalty of perjury that the foregoing is true and correct.


Dated: June 17, 2026

_____
Sarah Perry
Vice President and Senior Legal
Fellow of Defending Education

65