**CONSOVOY MCCARTHY PLLC**
J. Michael Connolly (PHV pending)
Paul R. Draper (Cal. Bar No. 345071)
paul@consovoymccarthy.com
Marie E. Sayer (PHV pending)
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423

**ALTVIEW LAW GROUP LLP**
John M. Begakis (Cal. Bar No. 278681)
9454 Wilshire Blvd., Suite 825
Beverly Hills, CA 90212
(310) 230-5580

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION**

| | |
|---|---|
| DEFENDING EDUCATION, <br><br> *Plaintiff*, <br> v. <br><br> MARIA ANGUIANO, in her official capacity as Regents, et al., <br><br> *Defendants*. | Case No. 8:26-cv-01574 <br><br> **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date: August 5, 2026 <br> Time: 1:30PM <br> Trial Date: Not set <br> Action Filed: June 18, 2026 |

i

# TABLE OF CONTENTS

Table of Authorities................................................................................................................iii

Introduction ..............................................................................................................................1

Background ................................................................................................................................3

    I.    The growing use of speech codes to punish student speech regarding gender identity.......................................................................................................3

    II.   UC's policies punish certain speech concerning gender identity. .......................4

    III.  Defending Education and this litigation..............................................................9

Argument..................................................................................................................................12

    I.    DE is likely to succeed on the merits..................................................................13

         A.   The SVSH Policy unconstitutionally compels speech. ....................13

         B.   The SVSH Policy is a content- and viewpoint-based restriction on speech.................................................................................16

         C.   The SVSH Policy is overbroad..........................................................20

         D.   The SVSH Policy is unconstitutionally vague. ................................24

    II.   DE satisfies the remaining preliminary injunction factors...............................27

    III.  The Court should not require an injunction bond..............................................28

Conclusion ...............................................................................................................................28

Certificate of Compliance .......................................................................................................30

Certificate of Service...............................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023)................................................................................13

*Alabama v. Sec'y of Educ.,*
   2024 WL 3981994 (11th Cir. Aug, 22, 2024) ........................................22

*Am. Trucking Assoc. v. City of Los Angeles,*
   559 F.3d 1046 (9th Cir. 2009) ...............................................................27

*Anchor Stone Christian Church v. City of Santa Ana,*
   777 F. Supp. 3d 1126 (C.D. Cal. 2025) .................................................28

*Ass'n of Cleveland Fire Fighters v. City of Cleveland,*
   502 F.3d 545 (6th Cir. 2007)..................................................................25

*Baird v. Bonta,*
   81 F.4th 1036 (9th Cir. 2023) ...................................................12, 27-28

*Bates v. Pakseresht,*
   146 F.4th 772 (9th Cir. 2025) ...................................................15-17, 19

*Castaneda v. Garland,*
   562 F. Supp. 3d 545 (C.D. Cal. 2021) ...................................................28

*Cohen v. San Bernardino Valley Coll.,*
   92 F.3d 968 (9th Cir. 1996)....................................................................25

*Connally v. Gen. Constr. Co.,*
   269 U.S. 385 (1925)................................................................................25

*Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't,*
   533 F.3d 780 (9th Cir. 2008)..................................................................17

*Dambrot v. Cent. Mich. Univ.,*
   55 F.3d 1177 (6th Cir. 1995)..................................................................25

*Davis v. Monroe County Bd. of Educ.,*
   526 U.S. 629 (1999)...........................................................................21-22

*Defending Education v. Olentangy Loc. Sch. Dist. Bd. of Educ.,*
   158 F.4th 732, 738 (6th Cir. 2025)........................................3, 4, 9, 14-16, 19

*Defending Education v. Stewart,*
   6:26-cv-03237 (W.D. Mo. June 16, 2026)................................................9

*DeJohn v. Temple University*,
  537 F.3d 301 (3d Cir. 2008) ...........................................................................3

*Doe 1 v. Marshall*,
  367 F. Supp. 3d 1310 (M.D. Ala. 2019) ................................................. 15-16

*Elrod v. Burns*,
  427 U.S. 347 (1976) ......................................................................................27

*Forsyth County v. Nationalist Movement*,
  505 U.S. 123 (1992) ................................................................................ 17, 22

*Foti v. City of Menlo Park*,
  146 F.3d 629 (9th Cir. 1998) ................................................................ 24, 26

*Gooding v. Wilson*,
  405 U.S. 518 (1972) ......................................................................................20

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ......................................................................................24

*Green v. Miss USA, LLC*,
  52 F.4th 773 (9th Cir. 2022) ............................................................ 4, 13-14, 22

*Griffin v. Bryant*,
  30 F. Supp. 3d 1139 (D.N.M. 2014) ............................................................18

*Healy v. James*,
  408 U.S. 169 (1972) ............................................................................1, 3, 25-26

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) .......................................................................27

*Hill v. Colorado*,
  530 U.S. 730 (2002) ......................................................................................26

*Iancu v. Brunetti*,
  588 U.S. 388 (2019) ......................................................................................19

*Janus v. AFSCME*,
  585 U.S. 878 (2018) ............................................................................13, 19, 22

*Johnson v. Couturier*,
  572 F.3d 1067 (9th Cir. 2009) .....................................................................28

*Keyishian v. Bd. of Regents*,
  385 U.S. 589 (1967) ........................................................................................3

*Mahanoy Area Sch. Dist. v. B.L. ex rel Levy*,
  594 U.S. 180 (2021) ......................................................................................23

*Matal v. Tam,*
  582 U.S. 218 (2017).............................................................................. 18, 22

*McCauley v. Univ. of the Virgin Islands,*
  618 F.3d 232 (3d Cir. 2010) .......................................................................24

*McGuire v. Marshall,*
  741 F. Supp. 3d 1112 (M.D. Ala. 2024) .....................................................26

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir 2021)............................................13-14, 20-21, 23

*Moody v. NetChoice,*
  603 U.S. 707 (2024).....................................................................................21

*Moss v. U.S. Secret Service,*
  572 F.3d 962 (9th Cir. 2009).......................................................................19

*Papish v. Bd. of Curators of Univ. of Mo.,*
  410 U.S. 667 (1973).......................................................................................3

*Parents Defending Education v. Linn Mar Cmty. Sch. Dist.,*
  83 F.4th 658 (8th Cir. 2023) .......................................................................24

*Pleasant Grove City v. Summum,*
  555 U.S. 460 (2009).....................................................................................19

*R.A.V. v. St. Paul,*
  505 U.S. 377 (1992).....................................................................................19

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015).....................................................................................16

*Riley v. Nat'l Fed'n of the Blind of N.C.,*
  487 U.S. 781 (1988).....................................................................................15

*Riley's Am. Heritage Farms v. Elsasser,*
  32 F.4th 707 (9th Cir. 2022) .......................................................................27

*Rosenberger v. Univ. of Virginia,*
  515 U.S. 819 (1995).....................................................................................18

*Saxe v. State Coll. Area Sch. Dist.,*
  240 F.3d 200 (3d Cir. 2001) ..............................................................17-18, 22

*Snyder v. Phelps,*
  562 U.S. 443 (2011).......................................................................................3

*Speech First v. Cartwright,*
  32 F.4th 1110 (11th Cir. 2022) .......................................................1, 3, 17, 19

v

*Speech First v. Fenves,*
    979 F.3d 319 (5th Cir. 2020)........................................................................................4, 25

*Telescope Media Grp. v. Lucero,*
    936 F.3d 740 (8th Cir. 2019)...............................................................................................19

*Tennessee v. Cardona,*
    737 F. Supp. 3d 510 (E.D. Ky. 2024)..................................................................................15

*United States v. Williams,*
    553 U.S. 285 (2008).......................................................................................................21, 24

*Vill. of Hoffman Est. v. Flipside, Hoffman Est., Inc.,*
    455 U.S. 489 (1982)............................................................................................................24

*Virginia v. Hicks,*
    539 U.S. 113 (2003)............................................................................................................20

*West Virginia v. Barnette,*
    319 U.S. 624 (1943)............................................................................................................13

**INTRODUCTION**

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher education]." *Healy v. James*, 408 U.S. 169, 180 (1972) (cleaned up). Our universities "serve as the founts of—and the testing grounds for—new ideas. Their chief mission is to equip students to examine arguments critically" and "participate in the civic and political life of our democratic republic." *Speech First v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022). But the University of California has chosen a different path. It has enacted a far-reaching "harassment" policy that punishes students for their speech and compels them to mouth support for UC's preferred viewpoints.

In particular, UC requires students to go along with UC's preferred view that gender is a fluid, mutable characteristic. Under the guise of preventing sexual harassment, UC's "Sexual Violence and Sexual Harassment Policy" prohibits so-called misgendering and deadnaming. Ex. A at 033.[1] And it threatens to punish students who express the "wrong" view on gender issues, like "complain[ing]" about a biological man using the women's restroom. Ex. B at 048; Ex. C at 052. It does this through (1) the Policy's overbroad and vague "hostile environment" harassment provision, which prohibits large swaths of "offensive" speech based on "gender, gender identity,

---

[1] Exhibits A-J are contained in the Declaration of Marie Sayer, which was filed contemporaneously with this motion. Citations to specific pages refer to the stamped, sequential exhibit pagination and not to a document's internal pagination.

1

gender expression, sex- or gender-stereotyping, or sexual orientation," Ex. A at 006, and (2) its Frequently Asked Question #14, which prohibits students from "misgendering" and using another student's "dead name." *Id.* at 033. The Policy applies on campus and off, including on students' personal devices and over the internet, and students can be reported by anyone at any time. *Id.* at 014, 018.

Defending Education seeks a preliminary injunction to protect the speech rights of its members: UC students who have views on sex and gender that UC disfavors. These students believe that people are either male or female, that biological sex is immutable and that people cannot change their sex. Accordingly, they want to use language, including pronouns and names, that reflects biological sex rather than someone's self-professed gender identity. *E.g.*, Student.A.Decl.¶10. They "do not want to be forced to affirm that a biologically female classmate is actually a male—or vice versa—or that a classmate is 'nonbinary' and neither male nor female." *E.g.*, *id.* ¶6. Being forced to express such speech would contradict their deeply held beliefs. *E.g.*, *id.* ¶5. But UC's broadly written Policy treats these students' speech as "harassment based on gender identity." Ex. A at 033. So they are forced to silence themselves or avoid using sex-specific pronouns altogether.

UC's Policy violates the First and Fourteenth Amendments. It compels speech, discriminates on content and viewpoint, and is overbroad and vague. The Court should enjoin its enforcement. Indeed, Defending Education recently secured a preliminary injunction against a similar pronoun policy governing K-12 schools, where students

2

have *fewer* First Amendment rights than university students. *See Defending Education v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 738 (6th Cir. 2025). And courts regularly enjoin speech-coercing hostile-environment provisions like UC's. *E.g.*, *Cartwright*, 32 F.4th at 1125-27; *DeJohn v. Temple University*, 537 F.3d 301, 313-18 (3d Cir. 2008). This Court should do the same.

## BACKGROUND

### I.    The growing use of speech codes to punish student speech regarding gender identity.

The First Amendment "reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). Nowhere is this principle truer than on college campuses. Indeed, "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180. "[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973).

But instead of promoting the "robust exchange of ideas," *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967), universities today are often more interested in protecting students from ideas that make them uncomfortable. They do this through speech codes. *See* Exs. D, E. Under the guise of preventing "discrimination" and "harassment," speech codes impose vague, overbroad, and content-based (and sometimes

3

viewpoint-based) restrictions on speech. Ex. D at 054; Ex. E at 068, 074. But "anti-discrimination" and "anti-harassment" policies cannot be used as a sword to compel students to speak in the way the government dictates, contrary to their deeply held beliefs. That is why courts have a "long-standing hesitation to enforce anti-discrimination statutes in the speech context." *Green v. Miss USA, LLC*, 52 F.4th 773, 792 (9th Cir. 2022); *see Speech First v. Fenves*, 979 F.3d 319, 338-39 n.17 (5th Cir. 2020) (collecting a "consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague").

The First Amendment notwithstanding, universities are increasingly using speech codes to censor minority viewpoints, especially when it comes to issues of gender identity. So-called "preferred pronoun policies" in particular subject students to formal discipline for referring to other students with pronouns that reflect biological sex rather than gender identity. *See, e.g.*, *Defending Education*, 158 F.4th at 738. Other university policies are written so broadly or vaguely that they effectively shut down all discussion or debate on transgender issues. *See* Ex. E at 074.

## II.    UC's policies punish certain speech concerning gender identity.

UC has joined this growing and unconstitutional trend. On December 22, 2025, UC issued a revised version of its "Sexual Violence and Sexual Harassment" Policy, which became effective January 1, 2026. Ex. A at 005. The Policy is designed to punish disfavored speech concerning, among other things, gender identity. It compels speech and discriminates on the basis of content and viewpoint, and it can be applied to a

4

substantial amount of protected speech, including speech that is at the core of the First Amendment. It "applies at all University campuses," including UCLA, UCI, and UCSD, and it applies to everyone connected with the UC System, including all undergraduate, graduate, and professional students. *Id.*

Two parts of the SVSH Policy unconstitutionally restrict student speech: its ban on hostile-environment harassment and its ban on so-called misgendering and deadnaming.

**The Hostile-Environment Provision.** The SVSH Policy prohibits, among other things, "sexual harassment" through a "hostile environment." *Id.* at 010. Hostile-environment harassment includes "unwelcome … sex-based conduct" that is "sufficiently severe, persistent or pervasive that it unreasonably denies, adversely limits, or interferes with a person's participation in or benefit from the education, employment or other programs or activities of the University and creates an environment that a reasonable person would find to be intimidating or offensive." *Id.* The Policy defines "other sex-based conduct" to include "acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on gender, gender identity, gender expression, sex- or gender-stereotyping, or sexual orientation." *Id.*

UC leaves no doubt that its ban on hostile-environment harassment covers protected speech. In addition to prohibiting certain "verbal" conduct, UC offers a non-exhaustive set of "examples" of prohibited language. *Id.* at 033-34. That list includes

5

the use of "derogatory names or slurs" or other "offensive terms." *Id.* It also includes "jokes" made about someone's "sexual orientation." *Id.*

**FAQ #14.** Included in the SVSH Policy are a series of "Frequently Asked Questions." *Id.* at 030-34. One question (FAQ #14) provides "examples of harassment based on gender identity." *Id.* at 033. The FAQ states that "intentional or repeated use of a name or pronoun inconsistent with the individual's gender identity (i.e., misgendering)" is "Prohibited Conduct." *Id.* FAQ #14 further prohibits "intentionally and repeatedly call[ing]" a "transgender man" by "his dead name (i.e., refer[ring] to a name that a transgender person was given at birth but that they no longer use)." And it prohibits "intentionally and repeatedly refer[ring]" to a transgender man "by 'Miss' or 'Ms.'" *Id.*

**Enforcement.** The SVSH Policy applies broadly, covering student speech that occurs during any UC program or activity, on any campus or other UC property, and even off-campus and unrelated to a UC program or activity so long as there are "continuing adverse effects on" or a "hostile environment" for students. *Id.* at 013-14. The Policy prohibits speech whether it occurs in person, over the internet, or via "other devices or forms of contact." *Id.* at 014. And it makes it easy to report students for engaging in prohibited conduct. "Any person can report conduct that may be Prohibited Conduct," even if they were not the target of the supposed harassment, and complaints can be submitted anonymously. *Id.* at 013, 018. In addition, most UC employees

6

are required to report suspicions of prohibited conduct, even if they are not sure that the conduct actually occurred. *Id.* at 012-13.

There is "no time limit for reporting." *Id.* at 014. And there are plenty of options for reporting: UCLA, UCSD, and UCI allow reports to be made online via reporting forms, via email, over the phone, or in person. Exs. F, G, H. University officials can also take action themselves without receiving a report. Ex. A at 023.

Students found to have engaged in prohibited conduct face consequences "up to and including dismissal" from the UC System. Ex. A at 016, 026. Short of that, UC threatens punishments including "revocation" of an awarded academic degree, "[s]uspension," "[e]xclusion" from areas of the campus or UC functions, "[e]xclusion from participation in designated privileges and activities for a specified period of time," "[d]isciplinary probation" that can likewise "restric[t] the student's privileges or eligibility for activities," "removal from university housing," and "written notice or reprimand to the student that a violation … has occurred and that continued or repeated violations … may be cause for further disciplinary action." Ex. I at 109-12. Other consequences could include "educational efforts, employment consequences, or educational consequences" and "informal counseling." Ex. A at 016. At all times, UC "keep[s] records of reports of Prohibited Conduct, and any actions taken in response to reports, including records" of "investigations, resolutions, and disciplinary action." *Id.* at 027.

**The SHAPE Training.** UC schools will aggressively pursue violations of the SVSH Policy, including the hostile-environment provision and FAQ #14. Students at UC schools are required to annually complete a mandatory training—the "Sexual Harassment, Anti-Discrimination, Prevention and Education" (SHAPE) training—to ensure their understanding of the SVSH Policy. Exs. B, C. If students do not complete the SHAPE training, they receive a "hold" on their student account that can prevent them from registering for classes. *See, e.g.*, Student.A.Decl.¶18; Ex. B at 049; Ex. C at 052.

The SHAPE training gives the following situation as an example of punishable harassment based on gender identity:

> My name is Mona, and I am transgender. My classmate Jane continues to call me James, which was my name before I transitioned. Jane refers to me as a man and complains when I use the women's restroom. I've asked her to stop, but she does not. I feel very disrespected and want this to stop.

Ex. B at 48-49. Even though this example presents protected speech under the First Amendment, students are asked to decide "what kind of prohibited conduct" the scenario describes and the correct answer is "hostile environment." *Id.* (Students are not given the option to say that the speech is not harassment.) The SHAPE training further states that a "hostile environment may be created when someone demands that others use a particular bathroom that does not correspond to their gender identity or uses the incorrect pronoun." *Id.* It also explains that "[i]ntentionally calling someone their name

8

used prior to transition, as opposed to their lived name, is called dead-naming, and may be a form of sexual harassment." *Id.*

## III.    Defending Education and this litigation.

Defending Education is a nationwide, grassroots, 501(c)(3) nonprofit membership organization whose members include students, parents, educators, and others concerned about the state of education in America. Perry.Decl.¶3. DE's mission is to prevent—through advocacy, disclosure, and, if necessary, litigation—the politicization of education. *Id.* DE has brought similar (and successful) challenges against pronoun policies and other speech codes in the school context. *E.g.*, *Defending Education*, 158 F.4th at 738; *Defending Education v. Stewart*, 6:26-cv-03237 (W.D. Mo. June 16, 2026), ECF 4-1 (university agreeing to dismantle its "bias response team").

DE has members who are harmed by the Policy, including Students A-D. Perry.Decl.¶6. Students A-D attend UC System schools. Student.A.Decl.¶3 (UCLA); Student.B.Decl.¶3 (UCSD); Student.C.Decl.¶3 (UCI); Student.D.Decl.¶3 (UCI). Students A-D believe that people are either male or female, that biological sex is immutable, and that sex does not change based on someone's internal feelings. *E.g.*, Student.A.Decl.¶5; Student.B.Decl.¶5; Student.C.Decl.¶5; Student.D.Decl.¶5. The students "regularly interact with other students and members of" their school communities "who identify as transgender or nonbinary." *See* Student.D.Decl.¶8; *see also* Student.A.Decl.¶8; Student.B.Decl.¶8; Student.C.Decl.¶8. For example, one student has "had at least one transgender or nonbinary student in each class" he has taken.

9

Student.C.Decl.¶8. The students have "no ill-will towards people who identify as transgender or nonbinary, but [they] do not want to be forced to affirm that a biologically female classmate is actually a male—or vice versa—or that a classmate is 'nonbinary' and neither male nor female." Student.A.Decl.¶6; Student.B.Decl.¶6; Student.C.Decl.¶6; Student.D.Decl.¶6. Doing so would contradict their deeply held beliefs. Student.A.Decl.¶¶5-7; Student.B.Decl.¶¶5-7; Student.C.Decl.¶¶5-7; Student.D.Decl.¶¶5-7.

When issues involving gender identity arise in class or in UC-affiliated activities, the students "want to speak about these topics and repeatedly state [their] belief that biological sex is immutable." Student.A.Decl.¶9; Student.B.Decl.¶9; Student.C.Decl.¶9; Student.D.Decl.¶9. The students want to use "pronouns and names that are consistent with [their] classmates' and professors' biological sex repeatedly and at all times, including inside and outside the classroom, in the classmates' presence, and when referring to the classmates outside their presence." Student.A.Decl.¶10; Student.B.Decl.¶10; Student.C.Decl.¶10; Student.D.Decl.¶10.

The students also want to "communicate [their] beliefs about controversial topics, including gender identity, on a regular basis and [do so] using [their] personal phone, computer, and on social media." Student.A.Decl.¶12; Student.B.Decl.¶12; Student.C.Decl.¶12; Student.D.Decl.¶12. The students want to "discuss these topics with other students and the broader" campus "community both on and off campus, including during off-campus events with no connection to any school-related activity." *Id.*

10

But under the Policy, the students can be punished for their protected speech, including for expressing an opinion about the nature of biological sex, declining to use another students preferred pronouns, disagreeing with another student's assertion about whether they are male or female, stating that a biological male who identifies as female should not be allowed to compete in women's sports, or expressing discomfort about sharing bathrooms with teachers or students of the opposite sex. DE's members are aware that "'intentionally and repeatedly call[ing]' another student by his or her 'deadname' or biological pronouns is considered 'deadnaming' and 'misgendering,' and constitutes harassment." Student.A.Decl.¶19; Student.B.Decl.¶20; Student.C.Decl.¶20; Student.D.Decl.¶20. They have also taken the SHAPE training that told them UC defines harassment to include the refusal to use another person's preferred name or pronouns and complaining about biological men who identify as women using the women's restroom. Student.A.Decl.¶18; Student.B.Decl.¶14; Student.C.Decl.¶19; Student.D.Decl.¶19.

Because of the Policy, the students remain silent in school environments or avoid using specific pronouns altogether. *See, e.g.*, Student.A.Decl.¶16 ("[W]hen asked my pronouns…, I skip the question and hope no one notices."); Student.B.Decl.¶17 ("[W]hen discussions about gender come up in online forums, … I avoid sharing my own views."); Student.C.Decl.¶17 ("I would like to encourage debate about these issues in groups I am involved in on campus, but [because of] UC's policies, … we do not have events where gender discussions would come up."); Student.D.Decl.¶15 ("I am

11

often in classes or small groups with people who identify as transgender and have to work hard to avoid pronouns or names in those situations."). The students self-censor because they "fear that expressing [their] belief that sex is immutable—by using bio-logically accurate pronouns or otherwise explaining [their] views—will cause [them] to be punished for violating UC's policies." Student.A.Decl.¶13; Student.B.Decl.¶13; Student.C.Decl.¶13; Student.D.Decl.¶13. For example, the students "refrain from using pronouns and avoid conversations involving sex and gender in public." Student.A.Decl.¶15; Student.B.Decl.¶16; Student.C.Decl.¶15; Student.D.Decl.¶15. DE brings this lawsuit on behalf of its members so that the Students can be free to express their deeply held beliefs—on or off campus—without fear of punishment.

## ARGUMENT

DE is entitled to a preliminary injunction if it establishes four things: (1) it is "likely to succeed on the merits of [its] claim"; (2) it is "likely to suffer irreparable harm absent the preliminary injunction"; (3) "the balance of the equities tips in [DE's] favor"; and (4) "a preliminary injunction is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). In cases involving violations of constitutional rights, the first factor is typically dispositive. *Id.* (explaining that success on the merits "usually demonstrates [plaintiff] is suffering irreparable harm" and "tips the public interest sharply in [plaintiff's] favor"). Because DE satisfies all four requirements, the Court should issue a preliminary injunction.

12

## I.    DE is likely to succeed on the merits.

DE is likely to prevail on the merits of its claims because the SVSH Policy unconstitutionally compels speech, regulates speech based on viewpoint and content, and is overbroad and vague.

### A.    The SVSH Policy unconstitutionally compels speech.

The Supreme Court has "held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus v. AFSCME*, 585 U.S. 878, 892 (2018). "[N]o official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia v. Barnette*, 319 U.S. 624, 642 (1943). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus*, 585 U.S. at 892. "[T]he First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply 'misguided.'" *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023).

That includes speech on matters of sex and gender. "Pronouns," for example, "can and do convey a powerful message implicating a sensitive topic of public concern." *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir 2021). They reflect a "'struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes.'" *Green*, 52 F.4th at 784 n.12 (quoting *Meriwether*,

13

992 F.3d at 508). Non-biological pronouns send the message that "[p]eople can have a gender identity inconsistent with their sex at birth." *Meriwether*, 992 F.3d at 507; *see also Green*, 52 F.4th at 784 (explaining that the use of the word "woman" itself "communicates [plaintiff's] views on womanhood"). Pronoun policies thus compel individuals to "communicate a message contrary" to their own position that sex is immutable and cannot be changed. *Green*, 52 F.4th at 785. They "skew th[e] debate" over pronouns by "forcing one side to change the way it conveys its message or by compelling it to express a different view." *Defending Education*, 158 F.4th at 738.

Here, Students A-D believe that biological sex is inherent and immutable. *E.g.*, Student.A.Decl.¶5; Student.B.Decl.¶5; Student.C.Decl.¶5; Student.D.Decl.¶5. They bear "no ill will" toward other students, but they "do not want to be forced to affirm that a biological male is actually female—or vice versa—or that another student is neither male nor female." Student.A.Decl.¶6; Student.B.Decl.¶6; Student.C.Decl.¶6; Student.D.Decl.¶6. Doing so would contradict their deeply held beliefs and, as they see it, harm the other individual by encouraging him or her to believe a lie. *Id.* Yet, that is exactly what the hostile-environment provision and FAQ #14 require. According to UC, it is "prohibited conduct" for a student to "intentionally and repeatedly" refer to a person by their "dead name" or by "a name or pronoun inconsistent with their gender identity." Ex. A at 033. Put simply, if Students A-D don't use UC's preferred language, they violate the university's policy.

The Ninth Circuit's decision in *Bates v. Pakseresht* is directly on point. 146 F.4th 772 (9th Cir. 2025). There, a devout Christian woman sought to open her home to children in foster care through adoption. *Id.* at 776. Oregon denied her application because she objected to the State's policy requiring prospective parents to "respect, accept, and support" a child's sexual orientation, gender identity, and gender expression by using "adopted children's preferred pronouns" and "acceptable and inclusive language." *Id.* at 776, 778. The Ninth Circuit held that this policy "quite clearly … compels speech" and was likely unconstitutional. *Id.* at 785-86. That was because "parental speech that promotes the state's conceptions of sexual orientation and gender identity is required, and speech that contradicts the state's views is prohibited." *Id.* at 785. The policy thus forced applicants to "reinforce the state's perspective of sexuality and gender identity as evolving concepts." *Id.*

That the SVSH Policy does not literally require students to speak is of no moment. Even if Students A-D could avoid the SVSH Policy's penalties by holding their tongues, compelled silence is compelled speech. *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796-97 (1988). Moreover, using pronouns is a "'virtual necessity'" for engaging in conversation. *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1325 (M.D. Ala. 2019). Pronouns are "central to everyday speech." *Defending Education*, 158 F.4th at 791 (Bush, J., concurring); *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 549 (E.D. Ky. 2024) ("[P]ronoun usage is pervasive given its ubiquity in conversation."). In "ordinary conversation … it would be all but 'impossible' to train oneself not to use pronouns when

15

referring to others." *Defending Education*, 158 F.4th at 758; *see, e.g.*, Student.D.Decl.¶16 (explaining that her "classmates gave [her] dirty looks and whispered about [her]" when she "slipped up" and accidentally "referred to a transgender-identifying student with biological pronouns" during a "class discussion"). UC thus "cannot force [students] to choose between carrying a government message" and remaining silent in another student's presence. *Doe 1*, 367 F. Supp. 3d at 1326.

In short, the Constitution prohibits UC from taking sides in the gender-identity debate. Whether a policy "compels" students to use a preferred name and pronoun, contrary to sex, or "restricts" them from using preferred pronouns, contrary to sex, it transgresses the First Amendment. *Bates*, 146 F.4th at 784-85 ("The situation would be no different if the state had restricted … speech favoring more 'progressive' views of sexuality and gender identity, while compelling speech along the lines of [a] more traditional understanding"). Universities cannot compel their preferred viewpoints.

## B.    The SVSH Policy is a content- and viewpoint-based restriction on speech.

Under the First Amendment, a government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A policy is "content based" if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* Content-based restrictions are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.*

16

The hostile-environment provision and FAQ #14 are content-based. As FAQ #14 and the SHAPE training confirm, UC prohibits "misgendering," calling a person by their "dead name," and "complain[ing]" when a biological man uses the women's restroom. Ex. A at 033; Ex. B at 048-49. The SVSH Policy thus "restricts certain speech … on the topics of sexual orientation and gender identity." *Bates*, 146 F.4th at 785. By "impos[ing] differential burdens upon speech on account of the topics discussed," and "draw[ing] facial distinctions defining regulated speech by particular subject matter," the Policy regulates speech based on content. *Cartwright*, 32 F.4th at 1126 (cleaned up).

In addition, the hostile-environment provision's definition of prohibited speech turns on the *listener's* reaction: Speech is disallowed if it is perceived as "unwelcome," "hostile," "offensive," "intimidating," or "aggress[ive]." Ex. A at 010. It is well established, though, that a listener's "reaction to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *see also Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209 (3d Cir. 2001) (Alito, J.) ("The Supreme Court has made it clear … that the government may not prohibit speech under a 'secondary effects' rationale based solely on the emotive impact that its offensive content may have on a listener."). Because the hostile-environment provision "allow[s] or disallow[s] speech depending on the reaction of the audience," it "run[s] afoul of … prohibitions on content-restrictive regulations." *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 787 (9th Cir. 2008).

More flagrantly, the hostile-environment provision and FAQ #14 punish speech based on viewpoint. *See Rosenberger v. Univ. of Virginia*, 515 U.S. 819, 829 (1995) (viewpoint discrimination is "an egregious form of content discrimination"). The hostile-environment provision, for its part, is facially viewpoint-based. It bars speech that is, among other things, "hostile," "unwelcome," "aggress[ive]," or "intimidat[ing]" towards someone based on "gender, gender identity, gender expression, sex- or gender-stereotyping, or sexual orientation." Ex. A at 010. But "[g]iving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017). Policies that prohibit "offensive" speech—that is, speech concerning biological sex that UC disfavors—therefore impose "viewpoint-discriminatory restrictions." *Saxe*, 240 F.3d at 206. Plus, because the hostile-environment standard turns on membership in certain protected categories, it effectively prohibits statements critical of a named group while permitting supportive statements. A statement that *affirms* someone's gender identity is allowed, but a statement that makes them feel *unwelcome* is not. "'It is difficult to imagine'" a *more* viewpoint-discriminatory policy than one that allows "'laudatory'" speech "'while prohibiting a different point of view (negatively critical) on a particular subject matter.'" *Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1184 (D.N.M. 2014).

FAQ #14 and the hostile-environment provision also prohibit misgendering, deadnaming, and other speech expressing the view that biological distinctions between males and females should be respected. Ex. A at 033; Ex. B at 048-49. In other words, they "pu[t] a thumb on the scale in favor of" the view "that individuals can have

18

genders that differ from their sex" and "that our society should refer to individuals using preferred pronouns." *Defending Education*, 158 F.4th at 755. Just as UC couldn't prohibit "speech favoring more 'progressive' views of sexuality and gender identity," it can't prohibit Students A-D from sharing their "more traditional understanding." *Bates*, 146 F.4th at 785. Thus, because they regulate viewpoint, the hostile-environment provision and the FAQ are "prohibited." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018).

Speech restrictions "based on viewpoint are prohibited" altogether. *Id.* at 11.; *see also, e.g.*, *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019); *Cartwright*, 32 F.4th at 1126 ("Restrictions … based on viewpoint are prohibited, seemingly as a per se matter." (cleaned up)). "[G]overnment suppression of speech based on the speaker's motivating ideology, opinion, or perspective is impermissible." *Moss v. U.S. Secret Service*, 572 F.3d 962, 970 (9th Cir. 2009). But even if the Policy were merely content-based, it would still be subject to strict scrutiny. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). And the Policy cannot satisfy that test either. "[R]egulating speech because it is discriminatory or offensive is not a compelling state interest, however hurtful the speech may be." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 755 (8th Cir. 2019). Even if it were, the Policy is not narrowly tailored. "In fact the only interest distinctively served by" the Policy "is that of displaying [UC's] special hostility towards" traditional views on sex and gender. *R.A.V. v. St. Paul*, 505 U.S. 377, 396 (1992). Suppressing disfavored viewpoints is not a compelling state interest.

## C.      The SVSH Policy is overbroad.

The First Amendment prohibits regulations that "punis[h] a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (cleaned up). This "expansive remedy" guards against the possibility that "the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech." *Id.* The freedoms protected by the First Amendment, in other words, "need breathing space to survive," so the government may regulate speech "only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972).

As explained above, the hostile-environment provision and FAQ #14 are unconstitutional in a substantial number of applications because they compel speech and discriminate based on content and viewpoint. Consider the statement: "I have no ill will toward you, but you are not a boy/girl. People are created either male or female and so you can never transition from one sex to another." *See* Student.A.Decl.¶¶5-7; Student.B.Decl.¶¶5-7; Student.C.Decl.¶¶5-7; Student.D.Decl.¶¶5-7. Or the view that biological men do not belong in the women's restroom. *See* Student.C.Decl.¶11. Or the opinion that it is "unfair" for men to compete in women's sports. *See* Student.B.Decl.¶13. Or the use of "pronouns and given names that are consistent with a classmate's biological sex." *See* Student.D.Decl.¶10. These viewpoints are all protected speech, *see Meriwether*, 992 F.3d at 511-12, but they are prohibited because they would be seen by the listener as hostile, unwelcoming, intimidating, or aggressive, Ex. A at

20

010. Indeed, FAQ #14 and UC's SHAPE training state explicitly that misgendering, deadnaming, and voicing qualms about men in women's restrooms are punishable speech. *See* Ex. A at 033; Ex. B at 048-49.

For FAQ #14 in particular, the unconstitutional applications of its ban on non-gender-affirming speech aren't just substantial relative to any legitimate applications; they are substantial "in an absolute sense" too. *United States v. Williams*, 553 U.S. 285, 292 (2008). Prohibiting speech on biological pronouns and names is the FAQ's *sole* function. In other words, coercing speech on "a sensitive topic of public concern," *Meriwether*, 992 F.3d at 508, is its "heartland applicatio[n]," *Moody v. NetChoice*, 603 U.S. 707, 744 (2024).

Misgendering and deadnaming aside, the hostile-environment provision is over-broad because it goes far beyond the circumscribed standard for actionable harassment laid out by the Supreme Court in *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 652 (1999). While universities can prohibit genuinely harassing *conduct*, they do not have unlimited authority to punish *protected speech*. To comply with this First Amendment boundary, harassment policies must be limited to conduct that is "so severe, pervasive, and objectively offensive that it denies its victims the equal access to education." *Id.* But UC's hostile-environment provision comes nowhere close to satisfying that stand-ard. Instead of targeting conduct that is sufficiently "severe, pervasive *and* objectively offensive," *id.* (emphasis added), it asks only whether the speech is "severe, persistent, *or* pervasive," Ex. A at 010 (emphasis added). And instead of punishing such activity

21

only when it "*denies*" other students "equal access to education," *Davis*, 526 U.S. at 652 (emphasis added), the provision asks whether the conduct "denies, adversely limits," or even just "interferes" with a student's education, employment, or other UC activities or programs, Ex. A at 010.

Courts regularly find policies that fail to honor the line drawn by *Davis* to be overbroad because they sweep in "a substantial amount of speech that is constitution-ally protected." *Forsyth County*, 505 U.S. at 130; *see, e.g.*, *Saxe*, 240 F.3d at 210, 215-16 (high school speech policy punishing "harassment" was overbroad because it "pro-hibit[ed] substantially more conduct than would give rise to liability under" *Davis*); *Al-abama v. Sec'y of Educ.*, 2024 WL 3981994, *6 (11th Cir. Aug, 22, 2024) (finding that a policy that "contravenes" the *Davis* standard "runs headlong into the First Amendment concerns animating" that decision). Simply put, there is no "'harassment exception' to the First Amendment's free speech clause." *Saxe*, 240 F.3d at 204; *see also Matal*, 582 U.S. at 244-47.

The hostile-environment provision's overbreadth problems are exacerbated by its focus on speech regarding "sexual orientation and gender identity," which are "sen-sitive political topics [that] are undoubtedly matters of profound value and concern to the public." *Janus*, 585 U.S. at 913-14 (cleaned up); *see also Green*, 52 F.4th at 784 n.12 (explaining that "for controversies regarding transgenderism," "an individual's use or omission of certain words and phrases in this context often reflects a 'struggle over the social control of language in a crucial debate about the nature and foundation, or

22

indeed real existence, of the sexes'"). Here, in particular, the provision covers speech that "relates to" Student A-D's "core religious and philosophical beliefs," where "First Amendment interests are especially strong." *Meriwether*, 992 F.3d at 509.

Finally, the SVSH Policy is overbroad because it applies to speech that occurs off-campus and unrelated to any UC programs. The only required hook is that the speech have some "continuing … effects on" members of the UC community. Ex. A at 014. Indeed, the Policy applies whether the speech occurs in person, over the internet, or via "other devices or forms of contact." *Id.* For example, Students A-D want to share their beliefs about sex and gender using their phones, computers, and on social media, and they want to speak about these issues "during off-campus events with no connection to school-related activity." *E.g.*, Student.D.Decl.¶12. But because of the SVSH Policy, they "avoid sharing [their] views" for fear of getting in trouble. Student.B.Decl.¶¶13, 17.

The Supreme Court, however, has held that universities' power to punish off-campus speech is extremely limited. *See Mahanoy Area Sch. Dist. v. B.L. ex rel Levy*, 594 U.S. 180, 189 (2021). Indeed, in *Mahanoy*, the Supreme Court held that a public high school student's use of "vulgar language and gestures criticizing both the school and the school's cheerleading team" on social media and off school grounds was constitutionally protected. *Id.* at 183-84. In reaching that result, the Court stressed that "[w]hen it comes to political or religious speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention." *Id.* at 190.

23

"Public university administrators are granted *less leeway* in regulating student speech than are public elementary or high school administrators." *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 242 (3d Cir. 2010) (cleaned up). So UC's ability to control off-campus student speech is even *more* limited here. By sweeping in off-campus and online speech unrelated to UC activities, then, the SVSH Policy "prohibits a substantial amount of protected speech" and is overbroad. *Williams*, 553 U.S. at 292.

### D. The SVSH Policy is unconstitutionally vague.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). This principle addresses two concerns: it ensures that regulated parties are not "punish[ed]" for "behavior that they could not have known was illegal," and it protects against "'arbitrary and discriminatory enforcement' by government officers." *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998); *see also Parents Defending Education v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 668-69 (8th Cir. 2023). And "when First Amendment freedoms are at stake, an even greater degree of specificity and clarity of law is required." *Foti*, 146 F.3d at 638; *see also Vill. of Hoffman Est. v. Flipside, Hoffman Est., Inc.*, 455 U.S. 489, 499 (1982) (If the challenged policy "interferes with the right of free speech or of association, a more stringent vagueness test should apply.").

To be consistent with the First and Fourteenth Amendments, a policy "must be sufficiently clear so as to allow persons of 'ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Foti*, 146 F.3d at 638. Policies cannot "forbi[d] or

24

requir[e] the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)). Policies must have "explicit standards for those who apply them," so as not to "delegat[e] basic policy matters to [officials] for resolution on an ad hoc and subjective basis." *Grayned*, 408 U.S. at 108-09.

The hostile-environment provision is void for vagueness because it gives students no guidance about what speech is permitted and what speech isn't. Indeed, it circularly defines "hostile environment" to include "acts of verbal … hostility." Ex. A at 010. And the remaining terms don't provide any clarification either. Students are told they could be punished if their speech is sufficiently "hostil[e]," "aggressi[ve]" or "intimidat[ing]." *Id.* But those terms are undefined and inherently subjective. They "beg for clarification." *Fenves*, 979 F.3d at 332 & n.9; *see also Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 972 (9th Cir. 1996). They require students to "make a subjective reference" to determine what speech is prohibited. *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1182, 1184 (6th Cir. 1995) (finding void for vagueness a policy prohibiting behavior that subjected another to "an intimidating, hostile, or offensive … environment").

On top of all of that, the SVSH Policy purports to regulate at least *some* off-campus speech, but leaves the exact scope of that coverage unclear. Students are told only that their off-campus speech is punishable if it has "continuing adverse effects

25

on" or "creates a hostile environment for" people on UC properties or in UC programs or activities, Ex. A at 014, but those limitations are themselves vague for the reasons explained above, *see McGuire v. Marshall*, 741 F. Supp. 3d 1112, 1185-86 (M.D. Ala. 2024) (explaining that a law may be unconstitutionally vague when its geographic scope is unclear).

Indeed, UC itself acknowledges that determining whether any given speech violates the Policy is an open-ended inquiry that depends on the "totality of the circumstances in which the conduct occurred." Ex. A at 010. And that is quintessential vagueness. Policies that require officials to "evaluate a myriad of factors" create a "danger" that they "might resort to enforcing [the policies] only against … messages" they "dislik[e]." *Foti*, 146 F.3d at 639.

At bottom, the SVSH Policy's vague standards deprive students of "a reasonable opportunity to understand what conduct [the Policy] prohibits." *Hill v. Colorado*, 530 U.S. 730, 732 (2002). And they create a serious risk that school officials will enforce the Policy in an arbitrary manner, determining on an "ad hoc and subjective basis" what speech is offensive (and thus deserves punishment) and what speech is acceptable. *Grayned*, 408 U.S. at 109. *Foti*, 146 F.3d at 639.[2]

---

[2] In addition to the SVSH Policy, UC has an "Anti-Discrimination Policy" that also "applies at all university campuses" and "addresses Harassment that is not covered under the" SVSH Policy. Ex. J at 115, 117. To the extent the Anti-Discrimination Policy is coterminous with the SVSH Policy and compels or prohibits the Students'

**II.    DE satisfies the remaining preliminary injunction factors.**

Because DE is likely to prevail on its constitutional claims, it readily meets the other preliminary injunction criteria. *See, e.g.*, *Baird*, 81 F.4th at 1040.

**Irreparable Harm.** In constitutional cases, irreparable harm "follows inexorably" from a finding on the likelihood of success on the merits. *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017). "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Id.* at 994; *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (The "loss of First Amendment freedoms, for even minimal periods of time" constitutes irreparable harm.). This case proves the point. Without a preliminary injunction, DE's members will be deprived of their First and Fourteenth Amendment rights, harms that "cannot be adequately remedied through damages." *Am. Trucking Assoc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009).

**Balance of Harms & the Public Interest.** As with irreparable harm, DE's likely success on the merits "tips [these] merged third and fourth factors decisively" in its favor. *Baird*, 81 F.4th at 1042. It is "always in the public interest to prevent the violation of a party's constitutional rights." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022). And the government "cannot reasonably assert" it is harmed

speech, that policy also violates the First and Fourteenth Amendments for the same reasons as the SVSH Policy.

27

when it is "enjoined from constitutional violations." *Baird*, 81 F.4th at 1042. These factors strongly favor a preliminary injunction here.

## III.    The Court should not require an injunction bond.

This Court has broad "discretion" under Rule 65(c) "'as to the amount of security required, *if any*,'" for a preliminary injunction. *Castaneda v. Garland*, 562 F. Supp. 3d 545, 562 (C.D. Cal. 2021) (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)). Because this case involves "public interests" and the "vindicat[ion]" of "a constitutional right," the Court should "dispense with the security requirement." *Anchor Stone Christian Church v. City of Santa Ana*, 777 F. Supp. 3d 1126, 1155 (C.D. Cal. 2025).

## CONCLUSION

For these reasons, the Court should grant DE's motion and preliminarily enjoin Defendants from enforcing the challenged provisions during this litigation.

Dated: June 24, 2026

Respectfully submitted,

/s/ Paul R. Draper

**ALTVIEW LAW GROUP LLP**
John M. Begakis (Cal. Bar No. 278681)
9454 Wilshire Blvd., Suite 825
Beverly Hills, CA 90212
(310) 230-5580
john@altviewlawgroup.com

**CONSOVOY MCCARTHY PLLC**
J. Michael Connolly (PHV pending)
Paul R. Draper (Cal. Bar No. 345071)
Marie E. Sayer (PHV pending)
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
mike@consovoymccarthy.com
paul@consovoymccarthy.com
mari@consovoymccarthy.com

*Local Counsel*

*Counsel for Plaintiff*

29

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defending Education, certifies that this brief contains 6,880 words, which complies with the word limit of Local Rule 11-6.1.

## CERTIFICATE OF SERVICE

I certify that on June 24, 2026, I electronically filed the foregoing memorandum, along with the accompanying motion, proposed order, and declarations, with the Clerk of the Court using the Court's ECF system, which will automatically email notification to all counsel of record. On June 24, 2026, I also served the foregoing memorandum and accompanying documents by email and by certified mail, return receipt requested, at the following addresses:

Charles F. Robinson
    General Counsel
Rhonda Stewart Goldstein
    Deputy General Counsel, Litigation
Office of The General Counsel of The Regents
1111 Franklin Street, 8th Floor,
Oakland, California 94607-5200
charles.robinson@ucop.edu
rhonda.goldstein@ucop.edu

Dated: June 24, 2026                    */s/ Paul R. Draper*
                                        Counsel for Plaintiff