UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| DEFENDING EDUCATION,<br><br>*Plaintiff,*<br><br>v.<br><br>MARIA ANGUIANO, in her official capacity as Regents, *et al.*,<br><br>*Defendants.* | Case No. 8:26-cv-01574-FWS-AYP<br><br>ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [8] |

## I.
## INTRODUCTION

Plaintiff Defending Education ("DE") alleges that Defendants, various University of California executives,[1] are violating the First and Fourteenth Amendments to the United States Constitution by way of a "a speech code that punishes students for engaging in protected speech[.]" (Dkt. 1 ("Complaint" or "Compl.") ¶ 2.) Before the court is DE's motion for a preliminary injunction prohibiting UC from enforcing the contested policy against DE's members. (Dkt. 8 ("Motion" or "Mot.").) UC opposes the Motion. (Dkt. 20 ("Opposition" or "Opp.").) DE filed a reply in support of the Motion. (Dkt. 23 ("Reply").) The court held a hearing on this matter on August 27, 2026. (Dkt. 26.) Based on the state of the record, as applied to the relevant law, the court **GRANTS IN PART** the Motion.

The policy Plaintiffs challenge is a portion of the University of California's policy against harassment. Part of that policy prohibits the "intentional or repeated use of a name or pronoun inconsistent with [an]

---

[1] The active Defendants in this case are: James B. Milliken, in his official capacity as President of the University of California; Catherine Criswell Spear, in her official capacity as the Executive Director of the Systemwide Office of Civil Rights; Nicoli Richardson, in her official capacity as the Systemwide Title IX Director; Julio Frenk, in his official capacity as Chancellor of UCLA; Mohammed Cato, in his official capacity as UCLA's Director of the Title IX Office; Howard Gillman, in his official capacity as Chancellor of UCI; Tierney Anderson, in her official capacity as UCI'S Assistant Vice Chancellor for Equal Opportunity and Title IX; Pradeep K. Khosla, in his official capacity as Chancellor of UCSD; and Michael Diaz, in his official capacity as UCSD's Director of the Office for the Prevention of Harassment and Discrimination and UCSD's Title IX Officer. For ease of reading, the court refers to the Defendants and the broader University of California system collectively as "UC".

individual's gender identity." (Dkt. 8-3 Ex. A ("Policy") at 033.)[2] Although this case implicates sensitive matters, the fundamental dispute between the parties is a straightforward question about how to interpret UC's policy: DE contends that the policy prohibits the commonplace or isolated use of birth names and biological pronouns; while UC argues that the policy would not punish that behavior without something more. The court finds that DE's interpretation of the policy is the correct one because it tracks UC's own materials about the policy.

With that understanding of the policy in mind, two recent cases establish that UC's policy goes too far in restricting protected speech. First, in *Bates v. Pakseresht*, 146 F.4th 772 (9th Cir. 2025), the Ninth Circuit held that requiring prospective adoptive parents to commit to "affirming" a child's sexual orientation and gender identity, in part by using preferred pronouns, "quite clearly restrict[ed] and compel[led] speech based on both content and viewpoint." *Id.* at 778, 784-85. Second, in *Defending Educ. v. Olentangy*, 158 F.4th 732 (6th Cir. 2025), the *en banc* Sixth Circuit enjoined a school district—which has more leeway to regulate speech than a university—from enforcing a similar policy against DE's members. *Id.* at 738.

Although the court therefore concludes an injunction is appropriate, the court finds that DE's proposed injunction is broader than necessary because DE seeks a wholesale injunction of UC's ability to enforce its hostile-environment provision against DE's members. The court finds that a narrower injunction is sufficient to provide total relief and therefore tailors the injunction to the facts of this case.

---

[2] The court follows the parties' briefing in using the term "biological pronouns" to refer to pronouns that correspond with a person's gender assigned at birth and using the term "preferred pronouns" to refer to pronouns that correspond with a person's gender identity.

## II.
## BACKGROUND

UC is a public university system composed of ten campuses across the state of California. (Compl. ¶ 12.) UC issues policies and standards that govern all ten campuses. (*Id.*) One such policy is UC's "Sexual Violence and Harassment Policy" which is over forty pages long and covers varied prohibited behaviors such as sexual battery and stalking. This case concerns the hostile-environment provision, which prohibits "unwelcome sexual or other sex-based conduct [that] is sufficiently severe, persistent or pervasive that it unreasonably denies, adversely limits, or interferes with a person's participation in or benefit from the education, employment or other programs or activities of the University and creates an environment that a reasonable person would find to be intimidating or offensive." (*Id.* at 010.) The Policy further defines "sex-based conduct" as "acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on gender, gender identity, gender expression, sex- or gender-stereotyping, or sexual orientation." (*Id.*)

The Policy also included a "Frequently Asked Questions" section, which read in part:

> **What are some examples of harassment based on gender identity covered by this Policy?**
>
> Prohibited Conduct under this Policy includes intentional or repeated use of a name or pronoun inconsistent with the individual's gender identity (i.e., misgendering). For example, when a transgender man is intentionally and repeatedly called by his dead name (i.e., refers to a name that a transgender

> person was given at birth but that they no longer use) or intentionally and repeatedly referred to by "Miss" or "Ms." by a professor in an intentionally mocking manner.

(*Id.* at 033 ("FAQ 14").) At the hearing on this matter, UC informed the court that it had amended FAQ 14 to read:

> **What are some examples of harassment based on gender identity that may be covered by this Policy?**
>
> Prohibited Conduct under this Policy may include intentional and repeated use of a name or pronoun inconsistent with the individual's gender identity (i.e., misgendering) in circumstances where the conduct is unwelcome, a reasonable person would find it intimidating or harassing, and the conduct otherwise meet the Policy's hostile environment harassment definition. For example, when a transgender man is intentionally and repeatedly called by his dead name (i.e., refers to a name that a transgender person was given at birth but that they no longer use) or intentionally and repeatedly referred to [as] "Miss" or "Ms." by a professor in an intentionally mocking manner.

(Dkt. 20-1 ("Spear Decl.") ¶ 17.)

Students or faculty who violate the Policy are subject to discipline up to and including dismissal. (Policy at 026.)

Apart from the Policy, UC students must also complete Sexual Violence and Harassment, Anti-Discrimination, Prevention and Education

("SHAPE") training. (Spear Decl. ¶ 18.) For some time, the SHAPE training included the following scenario as an example of conduct that creates a hostile environment:

> My name is Mona, and I am transgender. My classmate Jane continues to call me James, which was my name before I transitioned. Jane refers to me as a man and complains when I use the restroom. I asked her to stop, but she does not. I feel very disrespected and want this to stop.

(*Id.* ¶ 22.) UC declares that this example is no longer included in the SHAPE training. (*Id.* ¶ 23.)

Defending Education is an advocacy organization with members across UC. Four of DE's members, Students A, B, C and D (the "Students"), believe "that people are either male or female" and that gender identity is not "a coherent category separate from biological sex." (Dkts. 8-4; 8-5; 8-6; 8-7[3].) Were the Students to "refer to a biological male as 'she' instead of 'he,'" they "would be communicating an idea and belief that" they "firmly disagree[] with." (*Id.* ¶ 7.) The Students wish "to use pronouns and given names that are consistent with a classmate's biological sex . . . repeatedly and at all times, including inside and outside the classroom, in the classmates' presence, and when referring to the classmates outside their presence" but refrain from doing so out of fear that they would be punished under the Policy. (*Id.* ¶¶ 10, 13.) Student A studies at University of California, Los Angeles; Student B studies at the University of Californio, San Diego; Students C, and D study at

[3] Each student provides the quoted information at paragraph five of their respective declarations.

the University of California, Irvine. (*Id.* ¶ 3.)

DE moves for a preliminary injunction enjoining the University from:

> (1) enforcing the Hostile-Environment Provision and FAQ #14 and any materially similar policy, provision, or law that applies at UC System schools against Plaintiff's members, including Students A, B, C, and D. and
>
> (2) compelling Plaintiff's members, including Students A, B, C, and D, to affirm another person's gender identity; punishing them for referring to another person using pronouns that are consistent with the other person's birth sex but inconsistent with that person's gender identity; or otherwise punishing them for refusing to affirm another person's gender identity.

(Dkt. 8-8 ("Proposed Order").)

## II.
## LEGAL STANDARD

A preliminary injunction "is an extraordinary remedy that may be awarded only if the plaintiff clearly shows entitlement to such relief." *See Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (en banc) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

Plaintiffs seeking a preliminary injunction must demonstrate (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) that "the balance of equities tips in [their] favor"; and (4) that "an injunction is in the public interest." *Id.*

(quoting *Winter*, 555 U.S. at 20). A party seeking preliminary injunctive relief must make a "certain threshold showing" on "each [*Winter*] factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011). "The most important among these factors is the likelihood of success on the merits." *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1115 (9th Cir. 2023). "When, like here, the nonmovant is the government, the last two *Winter* factors merge." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (cleaned up).

## III.
## DISCUSSION

The court begins with DE's standing to challenge the Policy on behalf of its members. Then, because the court finds that DE has standing, the court turns to DE's showing on the preliminary injunction factors and finds that DE demonstrates that it is entitled to a preliminary injunction. Finally, the court turns to remedy and narrows DE's proposed injunction so that it is no broader than necessary.

### A. <u>DE Demonstrates it has Standing to Seek an Injunction of the Policy as Applied to its Members</u>

"Those who seek to invoke the power of federal courts must allege an actual case or controversy." *O'Shea v. Littleton*, 414 U.S. 488, 493 (1974). To do so, plaintiffs must show: "(1) actual or threatened injury (2) suffered as a result of the allegedly illegal conduct of the defendant, which (3) fairly can be traced to the challenged action and (4) is likely to be redressed by a favorable decision." *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1353 (9th Cir. 1994) (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464,

472 (1982)). Each "element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "Thus, at the preliminary injunction stage, the plaintiff must make a clear showing that she is likely to establish each element of standing." *Am. Encore v. Fontes*, 152 F.4th 1097, 1110 (9th Cir. 2025) (cleaned up).

DE relies on the "associational standing" doctrine which allows an association to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

UC argues that DE does not have standing because the Students face no injury under the Policy and therefore have no standing to sue in their own right. (Opp. at 15.) Generally, "[t]o establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). But when a plaintiff brings a pre-enforcement challenge to a statute or other governmental rule infringing upon a constitutional right, the "direct injury requirement is tempered in that one does not have to await the consummation of threatened injury to obtain preventive relief." *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (cleaned up). "Thus, in evaluating a pre-enforcement challenge, [courts] look to whether the plaintiff has shown [1] an intention to engage in a course of conduct arguably affected with a

constitutional interest, but [2] proscribed by a statute, and [3] there exists a credible threat of prosecution thereunder." *American Encore*, 152 F.4th at 1114 (cleaned up). A plaintiff's interpretation of a challenged statute should be accepted "so long as it is an arguable interpretation." *See id.* at 1116.

In this case, the court finds that the Students' planned conduct is "arguably affected with a constitutional interest" and at least arguably proscribed by the Policy such that there is a "credible threat" of punishment. *See id.* The Policy, by way of FAQ 14, prohibits "intentional or repeated use of a name or pronoun inconsistent with the individual's gender identity (i.e., misgendering)." The Students "wish to use the pronouns and names that are consistent with [their] classmates' biological sex repeatedly and at all times, including inside and outside the classroom, in the classmates' presence, and when referring to classmates outside their presence." (Dkts. 8-4; 8-5; 8-6; 8-7 ¶ 10.) The court thus finds it clear that that the Students' speech is arguably proscribed the Policy.

UC argues that FAQ 14 does not "govern how the Policy is applied," and that the Students' professed desire to use biological names and pronouns would not violate the Policy without more. (Opp. at 15-16.) But the court finds that the text of the Policy does not support that interpretation. The Policy itself refers readers to the "Frequently Asked Questions" section for information on how the Policy will be applied. (Policy at 007, 013.) And the court finds it proper to "consider [UC's] authoritative interpretation of" the Policy. *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d. 521, 544-45 (N.D. Cal. 2020) ("Thus, the Government's authoritative constructions of the Executive Order set forth in the FAQs published by the OFCCP, the OMB Memoranda, and the RFIs published in the Federal Register may be considered by the Court in evaluating Plaintiffs' facial challenge to the Executive Order."); *see also Forsyth County v. Nationalist*

*Movement*, 505 U.S. 123, 131 (1992) ("In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it.") Indeed, in *Olentangy*, the Sixth Circuit held that an email sent by the school district's counsel which explained how the district "interpreted its policies" created an injury sufficient for standing. 158 F.4th at 742. DE's interpretation of the Policy is also supported by the SHAPE training which cautioned that the intentional and repeated use of biological names and pronouns creates a hostile environment. (Spear Decl. ¶ 22.)

The court further finds that the Students have demonstrated a credible threat of enforcement. " 'All that is required is a mere scintilla of enforcement.' " *Matsumoto v. Labrador*, 122 F.4th 787, 803 (9th Cir. 2024) (quoting *Jackson v. Wright*, 82 F.4th 362, 367 (5th Cir. 2023)). When, as here, " 'the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing.' " *Arizona Right to Life*, 320 F.3d at 1006. UC notes that it "routinely" enforces the Policy to "protect the UC community." (Spear Decl. ¶ 24.) Although UC declares that it has not "disciplined" any students "for misgendering, deadnaming, or—without more—expressing an opinion about the nature of biological sex[,]" UC does not expand on what "without more" means in this context. (Spear Decl. ¶ 25.) In fact, an assertion that "enforcement would depend on the facts of the case[,]" can create a threat of enforcement. *Institute for Free Speech v. Johnson*, 148 F.4th 318, 329 (5th Cir. 2025) (cleaned up). Moreover, "lack of past prosecution does not preclude [a plaintiff's] standing." *Isaacson v. Mayes*, 84 F.4th 1089, 1101 (9th Cir. 2023). And the "lack of discipline against students could just as well indicate that speech has already been chilled." *Speech First v. Schlissel*, 939 F.3d 756, 766 (6th Cir. 2019).

The court thus finds that DE demonstrates that the Students would have standing to sue in their own right. Further, UC does not dispute, (*see generally* Opp.), and caselaw supports the conclusion that the interests DE seeks to protect are germane to its purpose and that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Olentangy*, 158 F.4th at 741 ("[DE] seeks to protect against efforts . . . to silence students who express opposing views. And it advances this goal through litigation like this suit. Turning to the third associational-standing requirement, the School District does not argue that the nature of the claims or remedies requires Defending Education's members to join the suit."). Accordingly, the court finds that DE satisfies the elements of associational standing.

Finally, the court finds that UC's argument that DE "does not have standing to enjoin application of the Policy systemwide[,]" is misplaced. (Opp. 17.) DE does not seek to enjoin the Policy as applied to all of UC's students. (*See* Proposed Order.) Rather, DE would have the Policy enjoined only against its members. (*Id.*) Because the Students have standing, that is sufficient for all of DE's members to secure relief. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("The association must allege that its members, *or any one of them*, are suffering immediate or threatened injury as a result of the challenged action[.]") (emphasis added). Illustrating this point: after remand in *Olentangy* the district court awarded an injunction protecting only and all of DE's members. *Parents Defending Educ. v. Olentangy*, 2026 WL 205616, at *2 (S.D. Ohio Jan. 27, 2026) (enjoining the defendants "from taking any action to enforce the policies ... against [DE's] members").

In sum, the court concludes that DE has standing to pursue its proposed injunction.

## B. <u>DE Demonstrates that it is Entitled to a Preliminary Injunction</u>

The court finds that DE is entitled to a preliminary injunction. On the first and most salient factor—likelihood of success on the merits—the court finds that DE demonstrates that the Policy compels speech and regulates speech based on viewpoint. Because UC does not argue that the Policy survives strict scrutiny, the court finds that DE demonstrates a likelihood of success on the merits of its First Amendment claim. And because "plaintiffs who are able to establish a likelihood that a policy violates the U.S. Constitution have also established that both the public interest and the balance of the equities favor a preliminary injunction[,]" the court finds that DE has met its burden. *Baird*, 81 F.4th at 1042 (cleaned up).

### 1. DE is likely to succeed on the merits of its First Amendment Claim

As an initial matter, the court finds that it should evaluate the Policy with the original version of FAQ 14 in mind even though UC amended FAQ 14 after DE filed this case. UC has not shown that it is "absolutely clear" that the challenged version of FAQ 14 "could not be reasonably expected to recur" so DE's challenge to the original version is not moot. *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 190 (2000); *see also Pub. Utilities Comm'n of State of Cal. v. FERC*, 100 F.3d 1451, 1460 (9th Cir. 1996) ("Courts have held that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot, unless there is no reasonable expectation that the wrong will be repeated.") (cleaned up). Moreover, the revised version of FAQ 14 continues to prohibit the intentional and repeated use of biological pronouns, albeit with reference to an objective harassment standard. (Spear

Decl. ¶ 17.)

a. <u>UC's Policy Regulates Speech</u>

The First Amendment to the United States Constitution prohibits any law "abridging the freedom of speech." U.S. Const. amend. I. The First Amendment applies to state and local governments through the Fourteenth Amendment. *New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964). In this case, UC argues that the Policy does not offend the First Amendment because it prohibits only "harassing or discriminatory conduct," rather than speech. (Opp. at 18.)

The "First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). The Supreme Court's speech-incident-to-conduct precedents "focus on" two questions: "whether the law in question restricts speech only because it is integrally related to unlawful conduct—or whether the law restricts expressive conduct only for reasons unrelated to its content." *Chiles v. Salazar*, 146 S. Ct. 1010, 1026 (2026). When the "only 'conduct' which the State [seeks] to punish is the fact of communication," the regulation is speech-based. *Cohen v. California*, 403 U.S. 15, 18 (1971).

In *Bates*, the Ninth Circuit rejected the argument that the compelled use of "designated pronouns" regulates speech "incidental" to conduct. 146 F.4th at 788. As already mentioned, that case dealt with a state policy which required prospective parents applying for adoption to agree to "respect, accept, and support" a child's sexual orientation, gender identity, and gender expression. *Id.* at 766. The state denied the plaintiff's application to adopt under this policy after she objected to, among other things, using adopted children's preferred pronouns. *Id.* at 766, 781-83. Because the plaintiff's

freedom to express her views "on sexual orientation and gender identity" were "severely circumscribed" and because the policy "force[d]" the plaintiff "to 'utter what was not in her mind' about a question of political and religious significance," it could not be "minimized as an incidental burden on speech." *Id.* 788; *cf. id.* at 811 ("The closest example of speech infringement that [the plaintiff] can offer in her as-applied challenge is the . . . recommended use of a child's preferred pronouns.") (Clifton J., dissenting); *see also Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021) (pronouns are "a matter of academic speech" because they communicate a message about whether "[p]eople can have a gender identity inconsistent with their sex at birth"). The court finds that *Bates* resolves the speech-incident-to-conduct issue against UC.

UC also argues that the hostile-environment provision does not regulate speech because it includes a "'reasonableness standard.'" (Opp. 19.) "There is no categorical 'harassment exception' to the First Amendment's free-speech clause." *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010) (cleaned up). Moreover, the original version of FAQ 14 prohibited the "intentional or repeated" use of biological pronouns without limitation to an objective harassment standard. But "a single instance of 'offensive' speech rarely rises to Title IX's harassment definition." *Perlot v. Green*, 609 F. Supp. 3d 1106, 1122–23 (D. Idaho 2022) (citing, among other cases, *Hawkins v. Sarasota Cty. Sch. Bd.*, 322 F.3d 1279, 1289 (11th Cir. 2003) (holding that "gender discrimination must be more widespread than a single instance of one-on-one peer harassment and [ ] the effects of the harassment [must] touch the whole or entirety of an educational program or activity")). The original version of FAQ 14 is therefore insufficiently tethered to "harassment that objectively denies a student equal access to a school's education resources" which universities

have more space to regulate. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 210–11 (3d Cir. 2001).

Finally, UC argues that the policy avoids regulating protected speech because it states that it "will not be interpreted to prohibit expressive conduct that is protected by . . . free speech and academic freedom principles." (Opp. at 19.) But a savings clause that "merely restates already-existing constitutional limits . . . 'cannot substantively operate to save an otherwise invalid [policy].'" *UFCW Loc. 99 v. Bennett*, 934 F. Supp. 2d 1167, 1206-07 (D. Ariz. 2013).

Following *Bates*, and recognizing that UC cannot "regulate speech under the guise of regulating conduct[,]" *Acosta v. City of Costa Mesa*, 718 F.3d 800, 812 n.6 (9th Cir. 2013), the court finds that the Policy regulates speech.

b. <u>UC's Policy Compels Speech and is Viewpoint-Based</u>

Having decided that the Policy regulates speech, the court looks again to *Bates* and *Olentangy* to find that the Policy compels speech and regulates based on viewpoint.

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l Inc.*, 570 U.S. 205, 213 (2013) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)). "It follows that any law that restricts speech based on content or viewpoint warrants most careful evaluation, and . . . strict scrutiny." *Bates*, 146 F.4th at 784-85. "Strict scrutiny likewise applies to a law that compels speech on these bases." *Id.* at 785.

To review the Students' planned speech in this case: the Students wish to always use biological names and pronouns and to convey a message about

the nature of gender by doing so. (Dkts. 8-4; 8-5; 8-6; 8-7.) DE argues that UC compels students to use preferred pronouns which, beyond compelling speech, amounts to a viewpoint-based regulation. (Mot. at 13-16.) The court finds that DE's position is supported by case law.

*Bates* held that a regulation which compelled adoptive parents to "affirm a child's sexual or gender identity" and "use a child's preferred pronouns" "quite clearly restrict[ed] and compel[ed] speech based on both content and viewpoint." 146 F.4th at 784-85. And *Olentangy* found it no less clear that a school district which forbade "using gendered language [that the student knew was] contrary to the other student's identity" "qualifie[d] as the type of 'viewpoint discrimination' that raises the most serious red flags under the First Amendment." 158 F.4th at 739. The court follows those cases and finds that the Policy compels speech and is viewpoint-based.

UC distinguishes these cases by relying on language from *Bates* that the state's position would have been "much stronger" had it "simply outlawed harassment or denigration of LGBTQ children." (Opp. at 21 (citing *Bates*, 146 F.4th at 787).) And language from *Olentangy* which noted that "schools may bar abusive 'invective' that targets 'specific' students—whether transgender students, religious students, female students, Hispanic students, or any others." 158 F.4th at 757. As UC sees it, that "is exactly what UC's Policy does." (Opp. at 21.) But the text of the Policy does not support UC's position. Again, the original version of FAQ 14 prohibited "intentional *or* repeated" misgendering without reference to an objective harassment standard. The court is therefore not persuaded that UC's Policy is meaningfully different from the regulation in *Bates* and the policy in *Olentangy*.

Because DE has demonstrated that the Policy compels speech and is viewpoint-based, the burden "shifts to [UC] to show that its actions were

nonetheless justified and tailored under a strict scrutiny analysis." *Bates*, 146 F.4th at 798 (internal quotation marks omitted). UC has not attempted to demonstrate that the Policy withstands strict scrutiny, so the court finds that it has not met its burden. (*See generally* Opp.) Accordingly, the court finds that DE is likely to succeed on the merits of its First Amendment claim.

DE also argues that the hostile-environment provision, even without reference to FAQ 14 or the SHAPE training, is unconstitutionally vague and overbroad. (Mot. at 21-22.) UC replies that the hostile-environment provision tracks the language endorsed by the Ninth Circuit in *O'Brien v. Welty*, 818 F.3d 920, 930 (9th Cir. 2016), and therefore passes constitutional muster. The court declines to reach those arguments at this stage of the case. DE's success on its other First Amendment theories is sufficient to demonstrate that is entitled to an injunction protecting the Students' planned speech. It is thus unnecessary to reach DE's facial overbreadth and vagueness challenges. And it is advisable to avoid doing so on this preliminary record because facial vagueness and overbreadth challenges are "manifestly strong medicine" to be used "sparingly and only as a last resort[.]" *Broadrick v. Oklahoma*, 413 U.S. 601 (1973) (overbreadth); *see also California Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1155 (9th Cir. 2001) (vagueness).

**2. DE Satisfies the Remaining Preliminary Injunction Factors**

It "is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017). And DE's "likelihood of success on the merits of [its] constitutional claim also tips the merged third and fourth factors decisively in [its] favor." *Baird*, 81 F.4th at 1042. It is "always in the public

interest to prevent the violation of a party's constitutional rights." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022). And UC "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983). Accordingly, the court finds that DE is entitled to a preliminary injunction.

**C. <u>DE's Proposed Injunction is Too Broad</u>**

DE asks the court to enjoin, not just FAQ 14, but the hostile-environment provision and "any materially similar policy, provision, or law that applies at UC System schools against Plaintiff's members, including Students A, B, C, and D." (Proposed Order.) The hostile-environment provision, to review, prohibits "unwelcome sexual or other sex-based conduct [that] is sufficiently severe, persistent or pervasive that it unreasonably denies, adversely limits, or interferes with a person's participation in or benefit from the education, employment or other programs or activities of the University, and creates an environment that a reasonable person would find to be intimidating or offensive." (Policy at 010.) The court finds DE's request to enjoin the enforcement of this provision is overbroad.

Although district courts have " 'considerable discretion in fashioning suitable relief and defining the terms of an injunction,' " such relief "must be tailored to remedy the specific harm alleged." *Washington v. Trump*, 145 F.4th 1013, 1037-38 (9th Cir. 2025) (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)). "The scope of a preliminary injunction must be no broader than necessary to provide complete relief to the named plaintiffs and members of organizational plaintiffs." *Los Angeles Press Club v. Noem*, 171 F.4th 1179, 1190 (9th Cir. 2026) (internal quotation

marks omitted). "It is an abuse of discretion to issue an overly broad injunction." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1188 (9th Cir. 2024).

The Students' planned speech—the use of biological names and pronouns without any subjective "ill-will," (Dkt. 8-4 ¶¶ 6, 7)—can be protected without a wholesale injunction of the hostile environment provision. *Olentangy* was careful to reinforce that "nothing" in the opinion "foreclose[d] the district from enforcing its anti-harassment policies against the abuse of transgender students just as it enforces those policies against the abuse of all other students." 158 F.4th at 738; *see also id.* at 775 n.4 (Thapar J., concurring) ("That's not to say the School District can't enforce its anti-harassment pronoun policies at all. If a bully calls a boy 'little princess' or 'baby girl,' that isn't protected speech. It's not speech on a political or social matter. Rather, it's a taunt that schools are free to regulate."). The court is concerned that under DE's approach UC would be overly constrained from preventing harassment that goes beyond the Students' planned speech. Although the court notes that "severe harassment" is "not easy to define with the precision required for a regulation of speech[,]" the court finds that DE's proposed injunction is not properly tailored. *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 209 (2021) (Alito J., concurring).

Illustrating this concern, and consistent with the Sixth Circuit's opinion, the district court in *Olentangy* was careful to avoid hampering the school district's ability to prevent harassment. After remand, the district court's injunction read:

> Defendants are hereby **ENJOINED**, during the pendency of this action, from taking any action to enforce the policies

> challenged by Plaintiff in this action (*i.e.*, Policy 5517, Policy 5136, and the Code of Conduct) against Plaintiff's members or their children for referring to another student, in a commonplace way, using pronouns that are consistent with the other student's birth sex but inconsistent with that student's gender identity. If any Defendant takes any action against one or more of Plaintiff's members or one or more of their children in violation of this Order, any member or member's child subject to such action may disclose the membership to the Defendant (including by making such disclosure through counsel), whereupon that Defendant must cease and/or reverse the violating action.
>
> It shall not be a violation of this Order for Defendants to enforce the anti-harassment policies challenged by Plaintiff in this action (*i.e.*, Policy 5517, Policy 5136, and the Code of Conduct) to prevent the abuse of transgender students, just as they enforce those policies to prevent the abuse of all other students.

*Olentangy*, 2026 WL 205616, at *2.

The court will therefore narrow DE's requested injunction to read as follows:

> Defendants are hereby **ENJOINED**, during the pendency of this action, from taking any action to enforce the policies challenged by Plaintiff in this action (i.e., the Sexual Violence and Sexual Harassment Policy and FAQ #14) against Plaintiff's

> members for referring to another person, in a commonplace way, using pronouns or birth names, that are consistent with the other person's birth sex but inconsistent with that person's gender identity. If any Defendant takes any action against one or more of Plaintiff's members in violation of this Order, any member subject to such action may disclose the membership to the Defendant (including by making such disclosure through counsel), whereupon that Defendant must cease and/or reverse the violating action.
>
> It shall not be a violation of this Order for Defendants to enforce the Sexual Violence and Sexual Harassment Policy to prevent the abuse of transgender students, just as they enforce the policy to prevent the abuse of all other students.

The court finds that the injunction language stated above is sufficient to provide complete relief to the Students and DE and follows the Supreme Court's caution that, "[g]enerally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328 (2006). It is preferable "to enjoin only the unconstitutional applications of a statute while leaving other applications in force[.]" *Id.*

Finally, the court addresses the issue of bond. When a district court grants a motion for a preliminary injunction, the plaintiff is generally required to post security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Courts routinely impose either no bond or a minimal bond in cases involving public interests

. . . That is particularly true when, as here, a plaintiff seeks to vindicate a constitutional right.” *Anchor Stone Christian Church v. City of Santa Ana*, 777 F. Supp. 3d 1126, 1155 (C.D. Cal. 2025) (cleaned up). Because DE seeks to vindicate a constitutional right and considering that UC did not request that DE be required to post bond, the court will exercise its discretion to forgo bond in this case.

## IV.
## DISPOSITION

The Motion is **GRANTED IN PART.** The court will issue an injunction consistent with this order. Further, the court **ORDERS** UC to respond to the Complaint on or before **October 8, 2026.**

**IT IS SO ORDERED.**

Dated: September 15, 2026

Hon. Fred W. Slaughter
UNITED STATES DISTRICT JUDGE